People *v.* Coon *et als.*

# THE PEOPLE OF THE STATE OF CALIFORNIA ON THE RELATION OF THE CENTRAL PACIFIC RAILROAD Co. OF CALIFORNIA *v.* HENRY P. COON, MAYOR, HENRY H. HALE, AUDITOR, AND JOSEPH S. PAXON, TREASURER OF THE CITY AND COUNTY OF SAN FRANCISCO.

COMPROMISE OF CENTRAL PACIFIC RAILROAD COMPANY WITH SAN FRANCISCO.—The Act of the Legislature, passed April 4th, 1864, authorizing the Board of Supervisors of the City and County of San Francisco to compromise and settle all claims upon the part of the Western Pacific Railroad Company and the Central Pacific Railroad Company, for bonds claimed by said companies, of said city and county, under the Act of April 22d, 1863, fully empowered said Board of Supervisors to make a settlement with said Central Pacific Railroad Company, by the terms of which the company released its claim for the six hundred thousand dollars of bonds claimed under the Act of 1863, and accepted in place thereof bonds of said city and county to the amount of four hundred thousand dollars, and the city and county released its right to stock in the company, and withdrew its subscription to the capital stock of the same. Said Act also fully empowered and authorized the said city and county to compromise with the Central Pacific Railroad Company, without compromising with the Western Pacific Railroad Company also.

INDIVIDUAL CORPORATORS OF MUNICIPAL CORPORATION.—The individual corporators of the City and County of San Francisco did not acquire such right in the capital stock of the Central Pacific Railroad Company, separate and distinct from the municipal corporation, as to disable the Legislature from conferring on the Board of Supervisors the authority to settle the claim of said company for six hundred thousand dollars of the bonds of said city and county, by withdrawing the subscription of the city and county to the capital stock of said company, and releasing its right to stock, and executing a less amount of bonds in lieu thereof.

MUNICIPAL CORPORATION.—A municipal corporation is an entity, possessing for many purposes the attributes of individuality, and in the exercise of its legitimate powers can only act by and through its agents appointed in the mode prescribed by the law of its creation. The rights of the individual corporators of a municipal corporation can only be enjoyed by and through the agents appointed by law to exercise the corporate powers.

JUDGMENT IN FRENCH *v.* TESCHEMAKER, 24 CAL. 518.—The judgment of the Supreme Court in the case of *French* v. *Teschemaker*, was, in a qualified sense, a final judgment, compelling the Board of Supervisors of the City and County of San Francisco to execute and deliver to the Central Pacific Railroad Company the six hundred thousand dollars in the bonds of said city and county, as specified in the Act of April 22, 1863.

PRACTICE IN CASES ORIGINALLY COMMENCED IN THE SUPREME COURT.—Where a judgment is rendered in the Supreme Court, as a Court of original jurisdiction, on an application for a writ of mandate, an application for a rehearing will not be entertained unless a motion for a new trial is made in the manner prescribed by the Practice Act in cases arising in the District Court.

APPLICATION to the Supreme Court for writ of mandate.

The facts are stated in the opinion of the Court.

*Shafter, Goold & Dwinelle*, for Relator.

The law of 1863, (Stats. p. 380,) authorizing the Board of Supervisors to make subscriptions to the capital stock of the Pacific Railroad was constitutional. (*French* v. *Teschemaker*, 24 Cal. 518.)

The vote of approval by the electors of San Francisco was not necessary to the validity of the law, but only a condition precedent to the exercise of the new franchise granted to the Board of Supervisors. (*Bank of Rome* v. *Village of Rome*, 18 N. Y., 4 Smith, 38; *Clarke* v. *City of Rochester*, 24 Barb. 446; *Corning* v. *Green*, 23 Barb. 33.)

The Legislature had the power to direct the Supervisors of San Francisco to levy six hundred thousand dollars by taxation, and pay it to the Central Pacific Railroad without any vote of the people of that city and county. They might have done so after the people had been authorized to vote upon the question, and on such vote had refused to levy the tax. They might have imposed the tax without any subscription being made, or any stock or other consideration received, except the incidental benefit from the construction of the road, and of the nature and extent of that benefit the Legislature is the exclusive judge.

" The Legislature is not confined in its appropriation of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the State. It can thus recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude or charity. Independently of express constitutional restrictions, it can make appropriations of money whenever the public well being requires or will be promoted by it; and it is the judge of what is for the public good. It can, moreover, under the power to levy taxes, apportion the public burdens among all the tax paying citizens of the State, or among those of a particular section or political division. It is well settled that the authority to raise money by the exercise of the taxing power

is not in conflict with the constitutional provisions protecting private property from seizure. The two principles co-exist in the Constitution, and it is not difficult to distinguish between them." (*Town of Guildford* v. *Supervisors of Chenango*, 3 Kernan, 13 Smith, 143; *Brewster* v. *City of Syracuse*, 19 N. Y., 5 Smith, 116; *The People* v. *Mayor of Brooklyn*, 4 N. Y., 4 Comst. 419; *Providence Bank* v. *Billings*, 4 Peters, 514, 561–563; *McCullock* v. *Maryland*, 4 Wheat. 428; *Blanding* v. *Burr*, 13 Cal. 356.)

An eminent instance of a large debt founded upon a merely valuable or meritorious consideration and forced upon a municipal corporation by Act of the Legislature, will be found in Laws 1858, page 183, section 2.

All the corporate franchises of the City and County of San Francisco are repealable by the Legislature, and it can therefore have no vested right under the grant of a franchise which the Legislature cannot divest. (Const. of California, Art. IV, Sec. 31; *McLaren* v. *Pennington*, 1 Paige, 102.)

And this power to alter and repeal is not restricted by any legislative limitations existing in the Constitution at the time when the original law is passed, but may be exercised under the fullest power of legislation contained in the Constitution as subsequently amended and existing at the time when the alteration or repeal is made. When the charter of a railroad corporation contained a clause authorizing the Legislature to repeal or alter it, the alteration of the charter, by the Legislature, made on the application of the directors, without consulting the stock subscribers, does not absolve the latter from their subscription. (10 Barb. 261.)

The franchise granted to the Board of Supervisors, authorizing them to hold railroad stock, was an extraordinary franchise; so extraordinary, that it was at first held under our Constitution to be unconstitutional. (*Low* v. *Marysville*, 5 Cal. 214.) But, like all corporate franchises, the power of repeal is expressly reserved in the Constitution. (Const. Cal. Art. IV, §31.)

This franchise could, therefore, be repealed at any time by

the Legislature; that is to say—the Legislature might withdraw the power to hold railroad stock, and prescribe the mode in which the city should dispose of it. (Angel & Ames on Corporations, Ch. XXII, §2, p. 733; *McLaren* v. *Pennington*, 1 Paige Ch. R. 102.)

The Legislature could not grant an irrepealable franchise to a municipal corporation. This would be allowing one Legislature to trammel the constitutional powers of all its successors. If a Legislature authorizes a municipal corporaration to issue bonds under a limitation that they shall be paid by a tax which is unconstitutional, the result is, not that the bonds are invalid, but that they shall be provided for by a tax which is not subject to any constitutional objection. (*Gilman* v. *City of Sheboygan*, 2 Black U. S. R. 510.)

The power to subscribe for stock, or to compromise, includes the power to pay money, or to issue bonds or other securities, and in the form prescribed in the ordinance. (2 Kent Comm. 278, etc. text and notes; *Berry* v. *Merchants' Exchange Company*, 1 Sandf. Ch. R. 280, 288; *Reinboth* v. *Mayor of Pittsburg*, 41 Penn. 278, 280, 283; *Seibert* v. *Mayor of Pittsburg*, Sup. Ct. U. S. Dec. Term, 1863.)

*H. H. Haight,* for Defendants.

The Act of April, 1864, confers upon a municipal corporation a special power, and, like all municipal charters and special powers, must be strictly construed and closely pursued. (Sedgwick on Stat. Cons. 465–7, 321–3, 338–40; 3 Comstock, 433; 21 Penn. 22; 5 Cal. 214; 13 Cal. 540; 20 Cal. 96; *French* v. *Teschemaker et al.*, 24 Cal. 518.)

The power to compromise and settle is, under the Act of 1864, a special power, and must be confined within the terms employed.

Restrictions upon the powers of municipal corporations are the settled policy of our laws.

The rules of construction applicable to municipal charters are those always applied to grants of special powers where the State confers or delegates a part of its sovereignty.

Much more strict will be the construction when it is sought, under the power, to donate to a private corporation nearly half a million of dollars of public revenue, without reckoning interest on the bonds to be issued.

Applying these rules to the Act of 1864, we claim that the Act authorizes no more than a reduction of the amount of subscription, and a change of the mode of payment to "cash or other security in place of bonds." It does *not authorize a donation of four hundred thousand dollars*, or any other amount; in other words, it authorizes a *subscription* for any amount less than six hundred thousand dollars, payable " in cash, etc., in *place* of the *bonds*," etc.

What was the *claim* to be settled? It was not a claim for damages, for money or bonds without equivalent. It was a claim to exchange certificates of stock for bonds. To settle such a claim is to fix the amount of subscription by reducing it, if possible, not by making a donation.

*H. & C. McAllister*, also for Defendants.

The decision in *French* v. *Teschemaker* adjudicated the constitutionality of the seventeenth section of the statute of April 22, 1863, and went no further.

The previous *mandamus*, sued out on the relation of " The Central Pacific Railroad of California" against the Board of Supervisors of the City and County of San Francisco, commanded said Supervisors to make the six hundred thousand dollars subscription called for by the Act of April 22d, 1863, and which had been voted at the special election held under the provisions of that statute; but did not dispose of the objections raised to the issuance of the bonds, which was a matter by no means identical with the question of subscription.

The right of the railroad company to demand of the Supervisors the act of subscription, was one thing; but their right to exact the issuance of the bonds was quite another thing.

Besides, the Act of April 4, 1864, *excludes* from the compromise any such bonds as were contemplated by the statute of April 22, 1863. The language is, "*to compromise and settle*

*all claims, etc., for cash or other security, in place of bonds claimed by said companies of said city and county, under an Act, etc.*"

However large and unlimited the powers given by the Act of April 4, 1864, there is one kind of security clearly interdicted, to wit: Such bonds as the statute of 1863 called for; the compromise is to substitute something in their place and stead. How, then, can this statutory power be construed to authorize the issuance of the original bonds? (*Starin* v. *The Town of Genoa*, 23 N. Y. 9 Smith, 454, 455.

The Act of April 4, 1864, has been misconstrued; it does not relieve San Francisco from her subscription, but simply authorizes its liquidation "in cash or other security," in lieu of the bonds originally proposed.

The statute of April 22, 1863, is neither expressly nor impliedly repealed by the Act of April 4, 1864. Its existence, validity, and operative force, have been recently recognized by this Court in the decision as to the previous *mandamus*.

"Whenever two Acts can be made to stand together, it is the duty of a Judge to give both of them full effect. Even where they are seemingly repugnant, they must, if possible, have such a construction that one may not be a repeal of the other, unless the latter one contain negative words, or the intention to repeal is made manifest by some *intelligible form of expression*." (*Brown* v. *County Commissioners*, 21 Penn. 43; *Bowen* v. *Lease*, 5 Hill, 226.)

The law recognizes interests and rights in the individual corporators of a municipality as beneficiaries, or *cestui que trusts*, separate and distinct from those of the legal entity, called the corporation, which stands merely as the trustee of these corporators, holding the legal title of the corporate property. (*Wetmore* v. *Story*, 3 Abbott Pr. R. 274–276; *Wood* v. *Draper*, 4 Abbott Pr. R. 323, 324; Redfield on Railways, 415, note.)

The proposition that the State has no power to divest vested rights, or to impair the obligation of contracts, applies

as well to cases of municipal corporations as to individuals. (*Grogan* v. *San Francisco*, 18 Cal. 612, 613.)


By the Court, CURREY, J.

The Legislature of this State, by an Act passed in 1863, authorized the Board of Supervisors of the City and County of San Francisco to take and subscribe one million dollars in the aggregate to the capital stock of "The Western Pacific Railroad Company" and "The Central Pacific Railroad Company of California," and to provide for the payment of the same. (Laws of 1863, p. 380.) By this Act it was made the duty of the Board of Supervisors to order a special election for the purpose of submitting to the electors of the city and county the proposition for the Board to take and subscribe four hundred thousand dollars to the capital stock of "The Western Pacific Railroad Company," and also the proposition for the same Board to take and subscribe six hundred thousand dollars to the capital stock of "The Central Pacific Railroad Company of California." It was provided by this Act that if a majority of the electors voting was in favor of the proposition to subscribe for the stock of said companies, then it should become the duty of the Board to take and subscribe, in the name of the City and County of San Francisco, for its use, benefit and advantage, to the capital stock of each of said companies in the amounts specified, and therefor to pledge the faith of the city and county for the payment of the same, in the manner provided in the Act. The Act also provided that the subscription should be made conditioned to be paid in the bonds of the city and county, which should be issued in the sum of one thousand dollars each, from time to time, as the work should progress on the railroad, by a Board, consisting of the President of the Board of Supervisors, otherwise called the Mayor of the City and County of San Francisco, and the Auditor and Treasurer of said city and county, and styled the "Pacific Railroad Loan Commissioners." The special election was held,

81

and the result of it was that a majority of the electors was in favor of the proposition submitted.

In April, 1864, an Act was passed by the Legislature by which the same Board of Supervisors was authorized and empowered " To compromise and settle all claims upon the part of the Western Pacific Railroad and the Central Pacific Railroad for cash or other security, in place of bonds claimed by said companies of said city and county, under an Act to authorize the Board of Supervisors of the City and County of San Francisco to take and subscribe one million dollars to the capital stock of the Western Pacific Railroad Company and the Central Pacific Railroad Company of California, and to provide for the payment of the same, and other matters relating thereto, approved April 22d, 1863 ; *provided*, that the power to make such compromise shall vest in said Board of Supervisors only after and in case said Board of Supervisors shall be compelled by final judgment of the Supreme Court to execute and deliver the bonds specified in said Act." (Laws 1863–4, p. 388.)

The Board of Supervisors having declined, after request to take and subscribe to the capital stock of the Central Pacific Railroad Company, an application was made to this Court for a peremptory writ of mandamus to compel said Board to proceed to make the subscription and issue the bonds therefor as provided in the Act of 1863. The respective parties to that proceeding appeared by counsel and argued the questions involved therein, after which this Court rendered a judgment granting the writ, which was issued in June, 1864, commanding said Board of Supervisors to take and subscribe in the name of the City and County of San Francisco, for its use, benefit and advantage, to the capital stock of the Central Pacific Railroad Company of California to the amount of six hundred thousand dollars, and for the payment of the same to pledge the faith of said city and county in the manner provided in the Act of 1863 ; and also commanding the Board of Supervisors to make an order directing the Board of Commissioners, styled "The Pacific Railroad Loan Commissioners," to

issue the bonds of the said city and county to the Central Pacific Railroad Company, upon the conditions as required and specified in and by the provisions of the Act.   This writ was served on the Board of Supervisors.

Pending the application for a writ of mandamus, the Board of Supervisors, on behalf of the city and county, and the Central Pacific Railroad Company, by its President, were engaged in an effort to effect a compromise of the matter in difference between them, which resulted, after the writ had been issued and served, in an agreement upon the terms thereof; and to carry the compromise agreed upon into effect the Board of Supervisors, on the 20th of June, 1864, duly passed an ordinance entitled " Providing for issuing bonds to Central Pacific Railroad Company."   By this ordinance, after reciting the Act of 1863 and the election under that Act, and the judgment of this Court granting the peremptory writ of mandamus, and the Act of 1864, authorizing and empowering the Board of Supervisors to compromise and settle all claims upon the part of the Central Pacific Railroad Company of California, the people of the City and County of San Francisco ordained as follows :

" SECTION 1.   Four hundred bonds of said city and county, each for one thousand dollars, with interest coupons attached, dated July 1st, A. D. 1864, in all other respects, in form, substance, and execution, such as are required by said Act first above mentioned, shall be forthwith made, executed, and delivered to said Central Pacific Railroad Company of California.

" SEC. 2.   The payment of said bonds and coupons shall be provided for, and made in all respects as is provided in said Act of April 22, 1863, and for such payment the full faith and credit of said city and county are hereby pledged.

" SEC. 3.   Said bonds and coupons shall be delivered to said Central Pacific Railroad Company of California upon the condition that the Board of Trustees or Directors of said company, at a regularly called meeting of the same, shall, by

a vote duly recorded, accept said bonds and coupons in full discharge of all obligations on the part of said city and county to make any subscription to the capital stock of said company, and for all claims, debts, dues, bonds, and coupons whatsoever. Upon the issuing and acceptance of said bonds and coupons, the same shall be deemed to have been so received and accepted, in place of the bonds and coupons mentioned and provided to be given in the Act of April 22, 1863, before mentioned."

This ordinance was duly approved by the Mayor on the 21st of June, and became a law on that day. Immediately thereafter the Central Pacific Railroad Company accepted the proposition contained in said ordinance, in accordance with the terms and conditions thereof, and signified the same to the Board of Supervisors. But the Mayor, Auditor and Treasurer, constituting the "Pacific Railroad Loan Commissioners," refused to issue the bonds, as provided in said ordinance, after demand duly made therefor on behalf of the Central Pacific Railroad Company.

The relator has applied by petition to this Court for a peremptory writ of mandamus commanding and requiring the respondents to issue to the Central Pacific Railroad Company of California the four hundred bonds specified in said ordinance. To the relator's petition setting forth the facts, in substance, as hereinbefore stated, the respondents have demurred. The grounds of the demurrer are in substance as follows :

First—It does not appear in or by said affidavit and petition that the respondents have any legal authority or power to execute or deliver to said Central Pacific Railroad Company the bonds referred to in said petition or any part thereof.

Second—It does not appear in said affidavit and petition that the Board of Supervisors of said City and County of San Francisco, or any officers of said corporation, had any lawful authority to issue or cause to be issued to said Central Pacific Railroad Company bonds to said amount of four hundred

thousand dollars, or any other amount, in the manner or for the causes or considerations alleged in said affidavit and petition.

Third—That said ordinance was passed without any lawful authority, and is wholly illegal and void.

Fourth—That the Act of the Legislature of this State, approved April 4th, 1864, so far as the same authorizes or attempts to authorize, the issuing of bonds by the said city and county to the Central Pacific Railroad Company, or the payment by said Board of Supervisors to said company of cash or other securities, is in conflict with the Constitution of this State, and is null and void.

The respondents for answer to the petition deny that the Board of Supervisors at any time became, or were lawfully bound or obliged, to subscribe six hundred thousand dollars, or any other sum, to the capital stock of the Central Pacific Railroad Company of California, or to make, execute, or deliver to said company bonds to any amount whatever; and they also deny that the judgment of this Court was a final judgment, compelling them to execute or deliver the bonds specified in the Act of eighteen hundred and sixty-three; and they further deny that they ever were or have been bound by law to execute or deliver to the Central Pacific Railroad Company said four hundred bonds; and they insist that said ordinance is wholly illegal and void, on the ground that neither the Board of Supervisors nor the Legislature had any right or power to make the Central Pacific Railroad Company a donation of four hundred thousand dollars, or any other sum of money belonging to the City and County of San Francisco.

The Act of eighteen hundred and sixty-three conferred on the corporate authorities of the City and County of San Francisco certain powers which were not comprehended by the general grant of powers contained in the Act consolidating the government of said city and county, passed by the Legislature in eighteen hundred and fifty-six. By the last section of the Act of eighteen hundred and sixty-three it is declared that this Act shall be in force and take effect from and after

its passage. It provided the mode by which the electors, the corporators of the city and county, might express their will in respect to the privilege granted by the Act to take and subscribe to the capital stock of the railroad companies. The duty to submit the proposition to the electors of the city and county as to whether or not stock of the railroad companies should be taken and subscribed for the use, benefit and advantage of San Francisco was imposed on the Board of Supervisors, and the electors were provided with the opportunity of expressing their choice on the subject. The creation of this law did not depend on the vote of the electors, and therefore the objection that was interposed to the Act considered in *Barto* v. *Himrod,* 4 Selden, 483, is without force as authority touching the Act under examination. (*Blanding* v. *Burr*, 13 Cal. 356 ; *The Bank of Rome* v. *The Village of Rome,* 18 N. Y. 41 ; *Starin* v. *The Town of Genoa,* 23 N. Y. 446 ; *Corning* v. *Greene,* 23 Barb. 50 ; *Grant* v. *Courter,* 24 Barb. 242; *Clarke* v. *Rochester,* 24 Barb. 472 ; *Moers* v. *City of Reading,* 21 Penn. 202.)

By the choice of the electors of San Francisco, an obligation onerous in its character was assumed, for the purpose of prospective benefits, which it was supposed would accrue to the city and county from the construction of the railroads mentioned in the Act, and it has been determined by the judgment of this Court that the Board of Supervisors were in duty bound to take and subscribe, in the name of the City and County of San Francisco, for its use, benefit and advantage, to the capital stock of the Central Pacific Railroad Company, as required by the provisions of the Act of eighteen hundred and sixty-three, and also to proceed to direct the Pacific Railroad Loan Commissioners to issue the bonds of the city and county to the Central Pacific Railroad Company, upon the conditions required and specified in and by the provisions of the same Act. The execution of this judgment has been suspended, if not entirely superseded by the joint action of the Board of Supervisors of San Francisco on the one part, and the Central Pacific Railroad Company on the other, under and

in pursuance of the provisions of the Act of April, eighteen hundred and sixty-four. But objections are interposed on the part of the respondents, to the effect, first, that the corporate authorities of San Francisco were not clothed with power to make the compromise agreed upon, and second, that the contingency specified in the proviso of the Act of eighteen hundred and sixty-four, and which stands as a condition precedent to the existence of authority in the Board of Supervisors to effect a compromise with the railroad company, has not transpired.

It is denied on behalf of the respondents that the Act of eighteen hundred and sixty-four conferred upon the Board of Supervisors the authority to compromise and settle the claims which accrued to the Central Pacific Railroad Company in the mode and upon the terms specified in the ordinance set forth. It is said the claim to be compromised and settled was not a claim on the part of the railroad company for money or bonds without a consideration in return, but was a claim to exchange certificates of stock for bonds, and that to settle such a claim is to fix the amount of subscription by reducing it if possible. The Act authorizing a compromise provides for the settlement of the claim of the railroad company for cash or other security in place of bonds claimed by the company, of said city and county, under the previous Act. It can hardly be maintained that a settlement of the claim of the railroad by taking a reduced amount of bonds of the city and county without some corresponding benefit to the company would amount to an adjustment of the difference between the parties by compromise. But be this as it may, the statute is simply a grant of power to the Board of Supervisors to compromise and settle the claim of the company for cash or other security in the place of the bonds to be issued under the first Act, upon the happening of the contingency mentioned in the proviso. No other limitation is placed upon the power whenever it might arise than the words of the Act itself import; that is, that the claim to be compromised and settled should be satisfied by cash or other security, in place of the bonds to which the com-

pany might be entitled under the Act authorizing the sub-
scription.

It is insisted that the Act of 1864 does not authorize San
Francisco to withdraw her subscription from either of the
railroad companies. There is nothing obscure or ambiguous
in the language of this Act. It seems to us apparent that the
authority granted by the Act was to the Board of Supervisors
to compromise and settle the claims of the respective com-
panies on such terms as in the wisdom of the Board would
best conduce to the interests of the City and County of San
Francisco, provided such settlement could be made for cash
or other security in the place of the bonds specified in the Act
of 1863. It is a fact judicially known to us that at the time
the Act of 1864 was passed, the case of *French* v. *Teschemaker*
was pending in this Court, by which it was sought to over-
throw, as unconstitutional, the Act of 1863, and in that case
we were advised that the plaintiff was in fact the representa-
tive of a considerable portion of the electors of the City and
County of San Francisco, who were opposed to subscribing
for stock of the railroad companies as authorized by the Act
of 1863, and by the election held in pursuance of its pro-
visions; and we may well suppose that the Act of 1864 was
passed in deference to the opinions of those opposed, and who,
we are not prepared to say, were not reasonably opposed to
the corporation of the City and County of San Francisco
becoming a member of the railroad companies mentioned in
the Act of 1863. So that if the object of the Act authorizing
a compromise is to be sought for in the light of concurring
circumstances, we might justly conclude it was designed to
give the City and County of San Francisco the opportunity to
sever its reluctant connection with these railroad companies
by a compromise and settlement effecting such object.

It is claimed, however, that the individual corporators of
the city and county acquired rights to the capital stock of the
railroad companies as beneficiaries, separate and distinct from
the municipal corporation as an entity, of which they cannot
be deprived, otherwise than by a majority vote therefor by the

electors of the city and county; and, as a consequence, it is maintained that the Legislature had no power to pass an Act conferring on the Board of Supervisors the authority to so compromise and settle the claims of the railroad companies as to divest the individual corporators of these vested rights held in trust for them by the corporate authorities. The answer to all this is, that the corporation of the city and county is the creature of legislative enactment, and in legal contemplation is an entity possessing for many purposes the attributes of individuality; and in the exercise of its legitimate powers can only act by and through its agents, appointed in the mode prescribed by the law of its creation. The Act of incorporation may be altered from time to time or repealed as the Legislature may will it. (Const. Art. 4, Sec. 31.) The powers of the corporation may be enlarged or restricted, and the Legislature may determine by law who, as the representatives of the corporation, shall exercise the powers granted. Hence it is that the rights of the individual corporators can only be enjoyed in subordination to the power of the Legislature over the subject. A contrary doctrine carried to its ultimate consequences would require the affirmative consent of each individual corporator to every act done by the corporate authorities affecting his interests before he could become bound by such act; the result of which would be to render entirely useless and nugatory the corporate government of the city and county.

The Legislature conferred the authority on the Board of Supervisors to compromise and settle the claims of each of the railroad companies mentioned, for cash or other securities in place of bonds specified in the previous Act, provided it should first be determined by the final judgment of this Court that the Board were bound to execute and deliver such bonds. By this Act the Board were permitted, in case the conditional contingency transpired, to enter into any compromise and settlement with the Central Pacific Railroad Company coming within the purview of the Act, which in their judgment would best subserve the interests of the city and county. The terms

of the compromise and settlement have been agreed to upon the hypothesis that the contingency on which the Board were authorized to act has happened ; and the railroad company, as a party to that compromise, has the right to its execution, unless the condition on which the authority of the Board of Supervisors depends remains to arise ; and this conducts us to the inquiry as to whether the judgment rendered by this Court in the case of the Central Pacific Railroad Company of California against the Board of Supervisors of the City and County of San Francisco, decided in June last, is a.final judgment, compelling the Board to execute and deliver the bonds specified in the Act of 1863.

It is maintained on the part of the relator that the construction given on behalf of the City and County of San Francisco to the judgment rendered by this. Court as a final judgment, compelling the Board of Supervisors to execute and deliver the bonds, is conclusive upon the city and county. We think it would be going beyond any just rule of law to so hold, for the reason that the Board of Supervisors have not the power by a construction of the effect of this judgment to assume an authority which depends for its existence upon this precedent condition.

The judgment referred to determined the obligation resting upon the corporation of San Francisco to take and subscribe to the capital stock of the Central Pacific Railroad Company, to be valid and binding, and the Board of Supervisors was required by this judgment to perform the obligation named, and to make an order directing the Pacific Railroad Loan Commissioners to issue the bonds to the Central Pacific Railroad Company upon certain conditions, and in all respects to perform and comply with the provisions and requirements of the Act. The judgment requiring the bonds to be issued was final, though the conditions upon which the duty to issue the same could only arise as the exigencies of the enterprise in contemplation might transpire, rendering the performance of this duty imperative. The judgment of the Supreme Court was a final judgment as to the obligations of the Board of

Supervisors as the corporate authorities of the city and county, and as the conditions on which the bonds required to be issued by the Act of 1863 might become consummate, this judgment could be enforced in case of refusal to issue and deliver the bonds, and therefore to all intents and purposes it was, from the time it was pronounced, a final judgment compelling the Board of Supervisors to execute and deliver the bonds specified in the Act.

It is further objected by the respondents that the Act of 1864 does not confer on the Board of Supervisors the power to compromise with one of the railroad companies without a compromise with the other also, and that therefore the ordinance referred to was passed without authority and is void.

The first section of the Act of 1863 provided for an election for the purpose of submitting to the electors " the proposition for the Board of Supervisors to take and subscribe four hundred thousand dollars to the capital stock of the Western Pacific Railroad Company ;". and " a proposition to take and subscribe six hundred thousand dollars to the capital stock of the Central Pacific Railroad Company of California." The elector could not vote for or against taking and subscribing to the stock of one of the companies only. He could only vote for or against the twofold proposition as a unit. The third section of the same Act authorized the Board of Supervisors, in case the election authorized the subscription, to take and subscribe in the name of the city and county, to the capital stock of the companies respectively, in the proportions prescribed in the first section, and therefor to pledge the faith of the city and county for the payment of the same in the manner provided in the Act. There is nothing in the Act requiring the Supervisors to deal with the two companies jointly ; nor is it provided that the action of one of the companies should at all be dependent upon or be controlled by that of the other. The two companies in their relations to each other sustained an individual independence from the passing of the election and the rights and obligations of each could not be affected by the action or conduct of the other. There is no

reason why the Act should be construed to require a compromise and settlement with one of these companies to be made in connection with a like compromise and settlement with the other. Such a construction of the Act might be attended with embarrassments that would entirely defeat its execution, however much it might be to the benefit and advantage of the City and County of San Francisco to adjust and settle the claim of one of such companies. A *construction that would most probably,* if not necessarily, be attended with such consequences cannot be adopted in consistency with the settled rules of construction of statutes.

We might extend this opinion to the consideration of other questions suggested by counsel, but we deem it unnecessary as the conclusion to which we have come would not be changed thereby. After a careful examination of the whole case we are of the opinion that the application should be granted.

It is therefore ordered and adjudged that a peremptory writ of mandamus be issued to the respondents, commanding and requiring them to execute and deliver without delay to the Central Pacific Railroad Company of California the four hundred bonds of said City and County of San Francisco, described in the ordinance hereinbefore referred to, with the interest coupons attached as in said ordinance provided.

By the Court, CURREY, J., on petition for rehearing.

The decision and judgment in this case was rendered early in September, eighteen hundred and sixty-four. About the tenth of that month, a written notice of such decision, as appears by proof before us, was personally served on the attorney for the respondents. On the thirtieth of the same month a petition was filed by new attorneys and counsel on behalf of respondents for a rehearing. Since then, and during the present term of the Court, the relators' attorneys have appeared and objected to the hearing and entertaining of this petition, on the ground that, as the case was originally commenced,

tried and determined in this Court, the judgment rendered cannot be reviewed on petition for a rehearing.

By the amended Constitution, power was granted to the Supreme Court to issue writs of mandamus, certiorari and prohibition, and it was by authority of the constitutional provision referred to that this Court, upon proper proceedings instituted, assumed to act in the premises.   Our judgment in the case was that of a Court of original jurisdiction, and for the correction of any error which we may commit in such cases the party aggrieved must pursue the course prescribed by the Practice Act in like cases arising in the District Courts, so far as may be.   It is unnecessary to refer to the particular provisions of the Act specifying the course to be pursued in order to obtain a re-examination of a case by the same Court of original jurisdiction, after one decision made therein.   The course prescribed by the statute has not been followed by the respondents in this case, and therefore the petition filed cannot be entertained.

It is therefore ordered that the petition for a rehearing be denied.

Mr. Justice RHODES expressed no opinion.