Points decided.

[No. 3,030.]

# THE CITY OF SAN FRANCISCO *v.* P. H. CANAVAN, JOS. G. EASTLAND, CHARLES E. McLANE (BOARD OF CITY HALL COMMISSIONERS), ROBERT GEORGE (SECRETARY), JOHN MIDDLETON, SAMUEL P. MIDDLETON (COMPOSING THE AUCTION FIRM OF JOHN MIDDLETON & SON), AND THE BOARD OF CITY HALL COMMISSIONERS. ALSO, A. P. HOTALING AND JAMES MOFFITT *v.* THE SAME DEFENDANTS.

DEDICATION OF LAND TO PUBLIC USE MUST BE IRREVOCABLE. — It is one of the essential elements of a good dedication that it shall be irrevocable, and that the land shall be forever dedicated for the public use which is designated, provided the public see fit to use it for that purpose. A reservation of the right to revoke the dedication, defeats the dedication.

VALID AND COMPLETE DEDICATION. — To constitute a valid and complete dedication, there must be an intention by the owner, clearly indicated by his words or acts, to dedicate the land to public use, and an acceptance by the public of the dedication.

ACCEPTANCE OF DEDICATION. — An acceptance of a dedication is generally established by a use by the public of the land for the purpose to which it had been dedicated. Until accepted, the dedication, whether made by deed or otherwise, may be revoked by the owner of the land.

NATURE OF USE NECESSARY TO CONSTITUTE ACCEPTANCE. — The public use, necessary to constitute an acceptance of a dedication, must be of such duration that the public interest and private rights would be materially impaired if the dedication were revoked and the use by the public discontinued.

EVIDENCE OF DEDICATION. — Where land was used in San Francisco as a cemetery, and was so marked upon the Van Ness map, and where the Legislature subsequently authorized the removal of the dead bodies and the dedication of the land to such public use as the Board might deem proper, and the Board undertook to dedicate it as a park: *held*, that the map was not evidence tending to prove a dedication as a public park.

TITLE OF SAN FRANCISCO TO PUEBLO LANDS. — Neither the former pueblo nor the City and County of San Francisco, as its successor, ever held an indefeasible proprietary interest in the pueblo lands. Such lands are held in trust for certain municipal purposes.

POWER OF THE STATE OVER MUNICIPALITIES AS TO PUEBLO LANDS. — When California was erected into a State of the American Union, it succeeded to the power which the Government of Mexico had before exercised over its municipalities, in respect to the control and disposal of the

| 42 | 541 |
| 79 | 379 |
| 79 | 454 |
| 42 | 541 |
| 81 | 77 |
| 81 | 79 |
| 42 | 541 |
| 90 | 531 |
| 42 | 541 |
| 92 | 217 |
| 42 | 541 |
| 95 | 470 |
| 42 | 541 |
| 101 | 273 |
| 101 | 392 |
| 42 | 541 |
| 107 | 409 |
| 42 | 541 |
| 124 | 356 |
| 125 | 577 |
| 42 | 541 |
| 139 | 549 |

pueblo lands, so soon as the title of the pueblo, or its successor, and the nature of the trust on which the lands were held, should be recognized by the proper tribunals of the United States.

PUEBLO LANDS IN SAN FRANCISCO. — The tenure by which the pueblo lands are held by San Francisco, is of a fiduciary nature, and cannot be alienated except in accordance with the trust.

POWER OF LEGISLATURE AS TO TRUST. — It is for the Legislature to decide how the trust, for which San Francisco holds the title to the pueblo lands, shall be performed.

MUNICIPAL CORPORATIONS SUBORDINATE SUBDIVISIONS OF THE STATE GOVERNMENT. — Municipal corporations are but subordinate subdivisions of the State Government, which may be created, altered, or abolished, at the will of the Legislature, which may enlarge or restrict their powers, direct the mode and manner of their exercise, and define what acts they may or may not perform, subject, however, to the limitation that the Legislature cannot direct the performance of an act which will impair the obligations of a contract.

POWER OF LEGISLATURE OVER MUNICIPAL CORPORATIONS. — The Legislature has the constitutional power to direct a sale of pueblo lands owned by a municipal corporation, by Commissioners, and an application of the proceeds to the erection of public buildings.

APPEAL from the District Court of the Fourth Judicial District, City and County of San Francisco.

The facts are stated in the opinions.

*McAllisters & Bergin* and *W. C. Burnett*, for Appellants.

1. The land in suit was dedicated as a public park to the use of the public. This is shown by the Acts of the Legislature of April 27th, 1860, of April 4th, 1864, of March 14th, 1868, and of March 4th, 1870; by the Order No. 447 of the City and County of San Francisco, and by the official acceptance on the part of the Board of Supervisors in appropriating the necessary moneys to improve and promote the usefulness of the park. (Wash. on Easements, 139, Sec. 21.) In *Rowan's Executors*, 8 B. Mon. 250, the Court say: "The dedication having been made  *  *  *  did not require a subsequent use to establish or prove it. (*Godfrey* v. *City of Alton*, 12 Ill. 35; *State* v. *Wilkinson*, 2 Verm. 485; *Abbott* v. *Mills*, 3 Verm. 527; *Brown* v. *Manning*, 6 Ohio, 298; *Le*

*Clercq* v. *Gallipolis*, 7 Ohio, 218; *Grant* v. *City of Davenport*, 18 Iowa, 186; *Warren* v. *Mayor of Lyons City*, 22 Iowa, 356; *Commonwealth* v. *Rush*, 14 Penn. St. 189.)

The learned counsel of the respondents claim that there was no dedication, because the ordinance reserved to the ·Board of Supervisors the power to alter or change the dedication.   But the answer is, that the city has never attempted to do so.   Whenever the city shall attempt to do so, then it will be time to consider the question of her power.   But whatever may have been the infirmities of the dedication, if any, which we do not admit, the repeated Acts of the Legislature cured them all.   (*Friedman* v. *Macy*, 17 Cal. 230; *Seabury* v. *Arthur*, 28 Cal. 150; *People* v. *Law*, 34 Barb. 571; *McCauley* v. *Brooks*, 16 Cal. 26, 27.)

A public park or square is an easement in which the inhabitants of the city have a vested right of which the Legislature cannot deprive them, except in exercise of the right of eminent domain.  (*New Orleans* v. *The United States*, 10 Pet. 660; *Van Ness* v. *The Mayor of Washington*, 4 Pet. 232; *Commonwealth* v. *Rush*, 14 Penn. St. 188; *Alves' Executors* v. *Henderson*, 16 B. Monr. 170; *Common Council of Indianapolis* v. *Croas*, 7 Ind. 12; *Trustees of Augusta* v. *Perkins*, 3 B. Monr. 441; *Lackland* v. *North M. R. R.* 31 Mo. 187; *Yates* v. *Milwaukie*, 10 Wall., U. S., 504.)

2. The land attempted to be sold is the corporate property of the city, which the Legislature cannot aliene without the consent of the city.

In support of the first branch of this proposition we have the direct admission of the Legislature in the very Act under which respondents profess to act—" they [the Commissioners] shall take possession of all that certain tract of land belonging to said city and county, and known as Yerba Buena Park" (Stats. 1869–70, p. 728, Sec. 2), and upon sale of it they are to make deeds in the name of the City and County of San Francisco, which shall be evidence of title

and right of possession in the grantee, etc. (Id. Sec. 5; see Stats. 1851, p. 307; Stats. 1860, p. 277; Stats. 1858, p. 70; Stats. 1863–64, p. 260; 13 U. S. Stats. p. 333, Sec. 5; U. S. Stats. 1865–66, Chap. 13.)

It must be admitted that after the cession of the country, and prior to the admission of the State into the Union, the title to these lands was either in the city or in the United States. During this period there could be no title in the State, as the State was not then in existence, and during the same period it is evident this alleged plenary power of the Governor and Departmental Assembly did not exist, as they were not in existence to exercise it, and the United States could not. It was a political power foreign to our system, which the cession of the country to the United States displaced. (*Pollard* v. *Hagan,* 3 How. 225; Vattel's Law of Nations, Book I, Chap. 19, Secs. 210, 244, 245, and Book 2, Chap. 7, Sec. 80.) It is clear, then, that during this period no Departmental Assembly, no Governor, could arbitrarily or otherwise dispose of public land; they were not in existence; they were unknown to the law. (*Mumford* v. *Wardell,* 6 Wal., U. S., 435; *Merryman* v. *Bourne,* 9 id. 601; *Fremont* v. *United States,* 17 How. 563; *People* v. *Folsom,* 5 Cal. 378; *Merle* v. *Mathews,* 26 Cal. 477.)

Now the State of California never owned the pueblo lands; did not, in fact, own a foot of land within her borders, save what she succeeded to in virtue of her right of sovereignty, or subsequently to her admission acquired by grant from Congress. She was admitted into the Union "upon the express condition that the people of said State, through their Legislature, or otherwise, shall never interfere with the primary disposal of the public lands within its limits, and shall pass no law and do no act whereby the title of the United States to, and right to dispose of the same, shall be impaired or questioned." (Brightly Dig. 105; *Ward* v. *Mulford,* 32 Cal. 372.)

The Legislature has the power to repeal the charters of municipal corporations, but as long as they are allowed to coexist as a part of the State Government they are not liable to be stripped of their property or funds. The acknowledged principle of constitutional law that forbids the State to tax the property or securities of the Federal Government or the salaries of its officers, and that vice versa precludes the United States from taxing State agencies, etc., applies with full force, and demonstrates the inadmissibility of any such power in the Legislature. (*McCullough* v. *The State of Maryland*, 4 Wheat. 316; *Weston* v. *The City of Charleston*, 2 Pet. 467; *The Collector* v. *Day*, 11 Wall., U. S., 113; *The Banks* v. *Th Mayor*, 7 Wall., U. S., 24; *The Banks* v. *Supervisors*, 7 Wall., U. S., 28; *Dobbin* v. *Commissioners Erie Co.* 16 Pet. 435; Cooley Const. Limitations, 482; *The State* v. *Haben*, 22 Wis. 665.)

Municipal corporations are like any other citizen, within the constitutional guaranty that "no person shall be deprived of life, liberty, or property, without due process of law." (*People* v. *Haws*, 37 Barb. 445.)

*J. C. McCeney, J. P. Hoge, I. M. Wilson,* and *J. B. Felton,* for Respondents.

Mexican pueblos did not have the absolute ownership of property, with full right of disposition. They held the pueblo lands merely in trust for municipal purposes. These purposes were to dispose of them by donation or sale to individuals, or to apply them to public uses, as directed by the Departmental Assembly, or other superior authority. The pueblo authorities could only alienate the lands by a power previously conferred on them, which the Sovereign could authorize or forbid. In the meantime, the Governor or other superior authority could dispose of the lots to individuals.

[Counsel here cited *Hart* v. *Burnett*, 15 Cal. 568, and the other cases which are cited on this point in the opinion in this case.—REPORTER.]

The City of San Francisco, and the city and county, became successors of the pueblo, and took and held the lands, not as proprietors, but merely in trust for municipal purposes, in the same manner that the former pueblo·held them. For this reason, sales on judgments and executions against the city were not good. (See cases above, particularly *Townsend* v. *Greeley*, 5 Wall. U. S. R. 337.) The decree of the Circuit Court of the United States (Judge FIELD presiding) recognizes the same view. The Acts of Congress cited in the complaint affirm the same principle. Congress could not change the character of these trusts. (*Hart* v. *Burnett*, 15 Cal. 575.) The power of the Legislature over these lands is complete and paramount. (*Payne* v. *Treadwell*, 16 Cal. 233; cases cited supra, and also *Dartmouth College Case*, 4 Wheat. 660; *East Hartford* v. *Hartford Bridge Co.* 10 How. 533, et seq.; *State of Maryland* v. *Balt. and O. R. R.* 3 id. 550.) The Van Ness Ordinance,·having been repealed before confirmation, by the Act of the Legislature, the vast amount of property described in it depends for validity solely on the power of the Legislature. (*Hart* v. *Burnett*, 15 Cal. 624; *City* v. *Beideman*, 17 id. 461, 462. See other cases cited above.) The Fund Commissioners act under the Acts of the Legislature, and independently of the municipal authorities. They have sold hundreds of lots, and these titles have always been held good. (*Babcock* v. *Middleton*, 20 Cal. 655; *Thornton* v. *Hooper*, 14 id. 9; *Davis* v. *Middleton*, id. 540.)

As to the general powers of the Legislature over the property and affairs of municipal corporations, see, in addition to the above cases: *People* v. *Board Supervisors San Francisco*, 11 Cal. 211; *People* v. *San Francisco*, 36 id. 595;

*Napa V. R. R.* v. *Supervisors, etc.* 30 id. 436; *Mayor, etc. of New York* v. *Hurze,* 3 Hill, 615; *French* v. *Teschemacher,* 24 Cal. 518; *People* v. *Com. Council Brooklyn,* 22 Barb. 412; *People* v. *Morris,* 13 Wend. 237. The Act of Congress of March 8th, 1866 (14 Stats. at Large, 4), which is referred to in the complaint, recognizes the power and control of the Legislature.

2. The triangular block in question never was dedicated to the public as a park. The complaint of the city and county does not allege any dedication of this land, but only that the city and county "has kept and reserved, and dedicated the same to the public use, forever, as a public park or plaza, at the future will and pleasure of said plaintiff." This would make a mere reservation, not a dedication, and in the future the lands could be devoted to other purposes. (*Pitcher* v. *New York and Erie Railroad Company,* 5 Sand. S. C. R. 608; *Board of Education* v. *Fowler,* 19 Cal. 24; *Grant* v. *City of Davenport,* 18 Iowa, 186.) This amounts, at most, to a mere license; acts of dedication must be clear, conclusive, and free from doubt or ambiguity. (*Harding* v. *Jasper,* 14 Cal. 649, and cases cited.) The ordinance introduced as proof of dedication is, if anything, stronger in negation of a dedication, for it expressly provides "that nothing contained in this order shall prevent the said city and county from devoting said land, at any time, to any public purposes, either State or municipal." It is of the essence of a dedication that it be irrevocable. (*Irwin* v. *Dixon et al.* 9 How. U. S. R. 30, and cases cited; Washburne on Easements, 139; *State* v. *Trask,* 6 Vermt. 355; *N. O.* v. *U. S.* 10 Pet. 622; *Commonwealth* v. *Alburger,* 1 Whart. 469; *Huber* v. *Gazley,* 18 Ohio, 18; *Missouri Inst.* v. *Horr,* 27 Mo. 211.)

The complaint of *Hotaling et al.* relies on what is called the Van Ness Ordinance Map, and the ordinances relating to the same, as effecting a dedication. This block lies in-

side, or to the eastward of Larkin street, whilst the Van
Ness Ordinance Map applies entirely to lands west of Larkin
and southwest of Johnson streets. When the map was in-
troduced, it showed no plaza, or land designated as such,
but merely a cross, indicating, doubtless, a cemetery, as it
had for years previously been used as such. The city could
dedicate only by ordinance; its powers are to be exercised
in the mode prescribed by the charter; the mode is the
measure of the power; the city could make no implied con-
tract; nor be bound by any act treating the land as dedi-
cated. (*Grogan* v. *San Francisco,* 18 Cal. 590; *McCracken*
v. *same,* 16 id. 616; *Pimenthal* v. *same,* 21 id. 363; *Satterlee*
v. *same,* 23 id. 318; *Herzo* v. *same,* 33 id. 140; *Zottman* v.
*same,* 20 id. 96; *Murphy* v. *Napa Co.* 20 id. 503; *French* v.
*Teschemacher,* 24 id. 550.)

An acceptance by the public is necessary to constitute a
dedication. Had the ordinance introduced to show dedica-
tion been clearly and unreservedly such, still its acceptance
by the public was necessary to make it effectual. It would
have been "but an offer to dedicate, by which the city could
lose nothing, and the public could acquire nothing, until the
offer should have been accepted. The doctrine upon this
point is so well settled as to leave neither encouragement
nor chance for discussion.". (*San Francisco* v. *Calderwood,*
31 Cal. 589, citing Washburne on Easements, 132, and cases
there cited; *Harding* v. *Jasper,* 14 Cal. 647; *Child* v. *Chap-
pel,* 9 N. Y. R. 257.)

Ordinarily there is no other mode of proving acceptance
than by a use by the public sufficiently long to evince an
acceptance. (Washburne on Easements, 139, 140.) "This
use ought to be such length of time that the public accom-
modation and private rights will be affected materially by
an interruption of the enjoyment." (*Cincinnati* v. *White,* 6
Peters, 431–439; 2 Smith's Lead. Cases, 182, and cases cited.)
Here it was clearly shown that this block of land never had

been used as a public park, and that its condition rendered such use impossible. It had been a cemetery for many years. The dead bodies had, to some extent, been removed, but many still remained when the Commissioners took possession. They, in grading and preparing the block for sale, removed several hundred dead bodies. Only after the Commissioners removed these remains, and graded the block, was it in a condition for any other use than a cemetery.

Where, by laying out a town and selling lots on the faith of streets, squares, and parks laid out, purchasers can claim a dedication, it is on the doctrine of estoppel—an estoppel in pais. (See Washburne on Easements, 144, et seq.; 2 Smith's Lead. Cases, 182; *State* v. *Trask*, 6 Vermont, 365; *State* v. *Cullen*, id. 530; *Rowan's Ex.* v. *Portland*, 8 B. Mon. 232–237; *Noyes* v. *Ward*, 19 Conn. R. 251–265.) The city here, in setting up this estoppel against herself, occupies a curious position. As was said in a similar case: "It is a new doctrine that a party can, without authority of law, create an estoppel for himself, and be permitted to say he is estopped by his own act. It is for others to interpose the objection of an estoppel, and not him who created it." (*Rector* v. *Hart*, 8 Mo. R. 457, et seq.) The use of a park or public square is never an appurtenant to property. It is not necessary to the use of the property adjacent. The property holder is only affected like the rest of the community. It is not like cutting a man off from the use of a street necessary to his property. (*De Armas et al.* v. *Mayor of New Orleans*, 5 La. R. [O. S. 125] 192.) This block of land, if ever dedicated at all, was dedicated as a cemetery. It has been doubted whether the common law principle of dedication applies to public burial grounds. It rests upon the principle that it would be "immoral, indecent, and even sacrilegious to reclaim at pleasure property which had been solemnly devoted to the use of the public in furtherance of some pious or charitable object." (See *Hunter* v. *Trustees*

*of Sandy Hill*, 6 Hill, 407, 442; 2 Smith's Lead. Cases, 182, 183, 193, et seq.; *Beatty* v. *Kentz*, 2 Pet. 584.) No complaint is made on this ground. All unite in desiring a removal of the cemetery—the municipal and State authorities as well as the individuals. Of course, such an act, by the direction of the Legislature, could not be pronounced "indecent or immoral." The plaintiffs proceed, in their complaints, on the ground that this was a pleasure ground, not a graveyard. The above authorities also show that when a cemetery has ceased to be such in fact, a dedication for that purpose ceases.

By the Court, CROCKETT, J.:

The only question which we are called upon to consider in these cases is, whether in enacting the Act of April 4th, 1870 (Stats. 1869–70, p. 738), providing for the erection of a City Hall in the City of San Francisco, the Legislature exceeded its constitutional power. The Act authorizes the Governor to appoint three Commissioners to superintend the work of erecting a City Hall, and directs them to take possession of all that certain tract of land belonging to said city and county, and known as Yerba Buena Park, to grade it to the official grade of the surrounding streets, and directs how the work shall be let and paid for. It also directs that a portion of Yerba Buena Park be subdivided into lots and subdivisions, and provides for the manner of doing it, and that, after the land is laid out, the Commissioners shall immediately proceed to sell, at public auction, the lots and subdivisions in such manner as will bring the largest sum or price possible, and directs the mode of doing it, and that, upon payment of the purchase price and interest, as therein provided, the Commissioners are to execute deeds, in the name of the City and County of San Francisco, to the purchasers, and that these deeds shall be prima facie evidence

of the regularity of the proceedings,  *  *  *  and shall be
evidence of the title and right of possession in the grantees,
upon which actions for the recovery of real property, or
injuries thereto, may be maintained and defended in all the
Courts of this State.    It is then provided, that all moneys
received from sales of the lots shall be paid into the City
Treasury, there to constitute a fund to be known as City Hall
Fund, and not to be drawn out or used except as provided
in the Act.    Provision is then made for the erection of a
City Hall, at a cost not exceeding one and a half millions of
dollars, on that portion of the land not sold, and for the man-
ner in which warrants are to be drawn on the City Treasury,
as funds are needed for the prosecution of the work.    If va-
cancies should occur in the Commission, they are to be tem-
porarily filled by the Board of Supervisors until the next
meeting of the Legislature, when the vacancies shall be
permanently filled.    On the completion of the work, the
Commissioners are to make a report and render an account
to the Board of Supervisors; and if any surplus remains of
the City Hall Fund, one hundred thousand dollars thereof,
if there be so much, shall be placed to the credit of the
School Department Fund of the city, to be used for the
erection of a normal school building in the city.    These
actions are brought for the purpose of enjoining the Com-
missioners from proceeding with the work, on the ground
that the Act of the Legislature is unconstitutional and void.
The plaintiffs applied for a temporary injunction, which was
denied, and they appeal from the order denying it.    The
Act is alleged to be unconstitutional on the ground—first,
that Yerba Buena Park was dedicated to the public as a
public park, and that the Legislature has no power to divert
it to any other use; second, that it is the property of the
City and County of San Francisco, as a municipal corpora-
tion, in its capacity of a proprietor of lands, and is as much
protected by the Constitution from invasion by the Legisla-

ture as the property of a private individual; third, that the
Constitution provides for the formation of counties, cities,
incorporated villages and towns, as subdivisions of the State
Government, with the intention that they should exercise
all the powers of local self-government which usually per-
tain to municipal corporations; and whilst it is conceded
that the Legislature may create, modify, or abolish these
corporations, and may direct the mode and manner in which
they shall exercise their powers, or may limit the extent of
their powers, it is denied that the Legislature can itself
usurp their functions or interfere with their proprietary
rights as owners of lands. In discussing the first point, it is
necessary to ascertain, primarily, whether or not the land
has been dedicated to the public as a park. It appears that
up to the time of the passage of the Act, this land had been
used as a public burying ground, and had never at any time
been used as a public park. On the contrary, since the
Commissioners commenced the work of grading the land,
very many dead bodies had to be removed and buried else-
where. So far, therefore, as an acceptance of the dedication
by the public might be inferred, from a public use of the
ground as a park, there is no proof in the record of such an
acceptance. But it is claimed that there was an express
dedication, by ordinance by the proper city authorities, and
that if an acceptance by the public was necessary, there has
been such an acceptance by reason of the appropriation of
large sums of money out of the City Treasury, under the au-
thority of the Legislature, for the purpose of removing the
dead bodies from the ground, in order to prepare it for use
as a public park. The ordinance referred to is in the follow-
ing words: "The Mayor is authorized and empowered to
take possession of the lot or parcel of ground, in the City
and County of San Francisco, situated between Market,
McAllister, and Larkin streets, and keep possession thereof
for and in the name of the City and County of San Fran-

cisco; and that the said land be, and the same shall be, known as Yerba Buena Park. That the same shall hereafter be known and designated as a public park, to be held and used for public and municipal purposes, and the same shall be, and is hereby dedicated to public uses as a public park or plaza; provided, that nothing contained in the said order shall prevent the said city and county from devoting the said land, at any time, to any public purpose, either State or municipal." It is one of the essential elements of a good dedication, that it shall be irrevocable, and that the land shall be forever dedicated to the public use which is designated, provided the public see fit to use it for that purpose. If a private person should, by deed, attempt to dedicate a parcel of land to public use, as a highway, street, park, or for any other public use whatsoever, and should, in the same deed, reserve the right, at his pleasure, to revoke the dedication, and to devote the land to any other use he might see proper, this would be no dedication. (*Irwin* v. *Dixon et al.,* 9 How. U. S. R. 30, and cases cited; Washburne on Easements, 139; *State* v. *Trask,* 6 Vermont, 335; *N. O.* v. *U. S.,* 10 Pet. 622; *Commonwealth* v. *Alburger,* 1 Whart. 469; *Huber* v. *Gazley,* 18 Ohio, 18; *Missouri Ins.* v. *Horr,* 27 Mo. 211.) The proviso in the ordinance, reserving to the city and county the right to devote the land, at any time, to any other public use, State or municipal, defeats the alleged dedication of the grounds as a public park, so far as a dedication is supposed to result from the ordinance itself. But if there had been no reservation in the ordinance, it would not, *proprio vigore,* have operated as a dedication of the land until the dedication had been accepted by the public. Until accepted, the dedication, whether made by deed or otherwise, may be revoked by the owner of the land. To constitute a valid and complete dedication, two things

must occur, to wit: an intention by the owner, clearly indi-
cated by his words or acts, to dedicate the land to public
use, and an acceptance by the public of the dedication.
This acceptance is generally established by the use by the
public of the land for the purpose to which it had been
dedicated. These propositions are thoroughly established
by a long line of decisions, and it will only be necessary to
refer to the following: *San Francisco* v. *Calderwood*, 31 Cal.
580; Washburne on Easements, 132; *Harding* v. *Jasper*, 14
Cal. 647; *Child* v. *Chappel*, 9 N. Y. Reports, 257; Wash-
burne on Easements, 239, 140. This use must be of such
duration that the public interest and private rights would
be materially impaired if the dedication were revoked, and
the use by the public discontinued. (*Cincinnati* v. *White*, 6
Peters, 431, 439; 2 Smith's Leading Cases, 182, and cases
cited.) In order to establish the dedication, the plaintiff
also produced what is known as the Van Ness Ordinance
Map. But the Van Ness Ordinance relates only to lands
lying west of Larkin street, and on the map made in pursu-
ance of the ordinance, this land is marked only by a cross,
to indicate its use as a cemetery. This map, therefore, did
not tend to prove the dedication as a public park. My con-
clusion on this branch of the case is, that the land has not
been dedicated to the public use as a park. I do not under-
stand counsel to claim that it was dedicated as a public
cemetery; but if it had been so dedicated, it had practically
ceased to be used as such, through the action of the city
authorities, before the passage of the Act; and I presume
it will not be contended that it was not competent for the
Board of Supervisors, as a police regulation merely, to pro-
hibit the use, as a public burying ground, of a parcel of
land situate nearly in the heart of a large and growing city.

In discussing the second ground on which the Act is
alleged to be unconstitutional it becomes material to inquire
into the tenure by which the title to this land was acquired

and is now held by the city and county.  It is conceded to
be a portion of what are known as the pueblo lands held by
the City and County of San Francisco, as the successor of
the former Mexican Pueblo of Yerba Buena.  The nature
of this title has been so often discussed and repeatedly adju-
dicated by this Court that it would now be a work of super-
erogation to undertake anew a critical analysis of it.  It will
be sufficient to state generally that it has been established
by these decisions too firmly to be shaken or overthrown at
this late day that neither the former pueblo, nor the city and
county, as its successor, ever held an indefeasible proprietary
interest in these lands.  On the contrary, they were and are
held only in trust for certain municipal purposes.  Under
the Mexican system, while the pueblo might dispose of the
lands or use them in pursuance of the trust on which they
were held, they were nevertheless subject to the disposition
of the Governor without the consent of the municipal author-
ities.  On the change of Government what had before been
known as the Pueblo of Yerba Buena was incorporated as
the City of San Francisco, and afterwards as the City and
County of San Francisco.  As the successor of the former
pueblo the city presented to the Board of United States
Land Commissioners its claim for a confirmation of its title
to these lands.  These proceedings resulted in a final decree
of confirmation by the Circuit Court of the United States
(to which Court the case had been transferred), by which
decree the trust on which the lands were held is distinctly
recognized.  Subsequently the Congress of the United States,
by two special Acts, released the fee of the land to the City
and County of San Francisco; but upon the trusts already
referred to.  Whilst the Mexican Government exercised
dominion over this territory, it had the power to direct how
the trust should be executed by the pueblo, and to enlarge
or limit its power in respect to the disposition of these lands;
and when California was erected into a State of the Amer-

ican Union, it succeeded to the power which the Government of Mexico had before exercised over its municipalities, in respect to the control and disposal of the pueblo lands so soon as the title of the pueblo, or its successor, and the nature of the trust on which the lands were held, should be recognized and ascertained by the proper tribunals of the United States created for that purpose. This has been done. The title has been recognized and the trust declared, not only by the Courts of the United States, to whom the subject was referred, but also by special Acts of Congress, as already stated. Acting upon its power to control and enforce this trust, the Legislature, as early as the year 1851, directed certain of these lands to be conveyed to several persons as Commissioners of the Funded Debt of the City of San Francisco, with power in the Commissioners to sell and convey said lands, and out of the proceeds to pay off the funded debt of said city. Numerous sales were made by these Commissioners, and the titles conveyed by them have been repeatedly recognized by this Court as valid. We have also decided, and it is now perfectly well settled in this State, that the City of San Francisco had no such proprietary interest in these lands as was subject to levy and forced sale on execution; that the tenure by which the lands were held was of a fiduciary nature, and could not be alienated except in accordance with the trust, and it was for the Legislature to decide how the trust should be performed. In support of these propositions, I refer to the following authorities: *Hart* v. *Burnett,* 15 Cal. 568, 573, *et passim; Payne* v. *Treadwell,* 16 id. 220; *Brown* v. *San Francisco,* id. 457; *City and County of San Francisco* v. *Beideman,* 17 id. 461; *Leese* v. *Clark,* 18 id. 573; *Brenham et al.* v. *Mayor of San Jose,* 24 id. 602; *Greeley* v. *Townsend et al.,* 25 id. 610; *Redding* v. *White,* 27 id. 285; *Grogan* v. *San Francisco,* 18 id. 614; *Steinback* v. *Moore,* 30 id. 506; *Board of Education* v. *Fowler,* 19 id. 20; *Fulton* v. *Hanlon,* 20 id. 480, et seq.; *White* v. *Moses,*

21 id. 41; *Carleton* v. *Townsend,* 28 id. 223; *Holliday* v. *Frisbie,* 15 id. 635; *Townsend* v. *Greeley,* 5 Wallace, U. S. R. 326; *Townsend* v. *Burbank,* id. 337; *Seale* v. *Doane,* 17 id. 484; *Kissling* v. *Shaw,* 23 id. 445; *Hubbard* v. *Sullivan,* 18 id. 525; *McCracken* v. *San Francisco,* 16 id. 621; *People* v. *Coon,* 25 Cal. 649; *People* v. *San Francisco,* 36 id. 601; *San Francisco* v. *Calderwood,* 31 id. 588; *People* v. *Doe,* 36 id. 222. These authorities conclusively establish that the tenure by which these lands are held is wholly different from that by which lands acquired by a municipality by gift or purchase are ordinarily held; and whatever may be the extent of the legislative power over the latter class of lands, there can be no doubt, I think, that in respect to pueblo lands it is competent for the Legislature to control and direct how they shall be managed and controlled, or disposed of by the municipal corporation.

The last proposition urged by the appellants is, that, inasmuch as the Constitution provides for the organization of county, city, and town governments for the administration of their local affairs, the necessary implication is, that it was intended to prohibit the Legislature from usurping the functions of these municipal bodies by taking upon itself, through its constituted agents, against the will and without the consent of the municipal authorities, the performance of duties which pertain only to the municipal body itself. In support of this argument it is said that the erection of a City Hall is a purely local improvement, and that it was for the city and county to determine for itself whether it needed such an improvement, and if so, when and how it should be made, and at what cost, and how the expense should be defrayed. But it is well settled, in this State at least, that municipal corporations are but subordinate subdivisions of the State Government, which may be created, altered, or abolished, at the will of the Legislature, which may enlarge or restrict their powers, direct the mode and manner of their exercise,

and may define what acts they may or may not perform, subject, however, to the limitation that the Legislature cannot direct the performance of an act which will impair the obligation of a contract. On the theory of the appellants it would be difficult, if not impracticable, to define the line at which the power of the Legislature to interfere in the affairs of a municipal corporation would terminate. We have already decided that it may compel the corporation to reduce the grade of a street, and may prescribe the details for letting out the contract, etc. (*People ex rel. Ferguson* v. *San Francisco*, 36 Cal. 595, 601.)

In *Payne* v. *Treadwell*, 16 Cal. 233, this Court says: "The principle of the numerous cases cited is, that a municipal corporation is a public institution, created for public purposes; that the municipality is a political subdivision or department of the State, governed and regulated and constituted by public law; that the agents who administer its affairs derive their power from the Legislature, and can only act in obedience to legislative authority; that the original power to control, as well as to create them, therefore, is in the Legislature, and that the Legislature can as well immediately direct the use and disposition of the public property, as a general rule, as it can mediately do this by appointing or providing for the appointment of agents, or giving authority for that purpose; in other words, what the Legislature can authorize to be done, it can itself do. The agents of the corporation can sell or dispose of the property of the corporation only in the way and according to the order of the Legislature; and, therefore, the Legislature may, by law operating immediately upon the subject, dispose of this property, or give effect to any previous disposition or attempted disposition of it. The property itself is a trust, and the Legislature is the prime and original controlling power, managing and directing the use, disposition, and direction of it. Otherwise the solecism would appear of a derivative .

power higher in degree and different in kind from the source of its derivation." In *Hart* v. *Burnett*, 15 Cal. 568–573, *et passim*, the same views substantially, if not directly expressed, were distinctly intimated. These decisions have been too long acquiesced in to be now overthrown; and so many valuable property rights have, doubtless, been acquired on the faith of them, that disastrous consequences would ensue if a different rule was now established. In my opinion the Act in question is not unconstitutional, and the application for an injunction was properly denied.

Order affirmed.