Filed 1/10/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF HUNTINGTON BEACH, | |
| Plaintiff and Respondent, | G057013 |
| v. | (Super. Ct. No. 30-2018-00984280) |
| XAVIER BECERRA, as Attorney General, etc., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James L. Crandall, Judge.  Reversed and remanded with directions.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Stepan A. Haytayan and Jonathan M. Eisenberg, Deputy Attorneys General, for Defendant and Appellant.

Michael E. Gates, City Attorney, and Brian L. Williams for Plaintiff and Respondent.

\*        \*        \*

**INTRODUCTION**

The California Values Act, Government Code section 7284 et seq. (the CVA), restricts the ability of local law enforcement agencies to inquire into immigration status, place individuals on an immigration hold, and use personnel or resources to participate in certain immigration enforcement activities. The issue we address is whether charter cities are exempt from compliance with one part of the CVA, Government Code section 7284.6 (section 7284.6), on the ground it infringes the authority of charter cities under article XI, section 5, subdivision (b) of the California Constitution to create, regulate, and govern city police forces.

We hold section 7284.6 is constitutional as applied to charter cities because it addresses matters of statewide concern—including public safety and health, effective policing, and protection of constitutional rights—is reasonably related to resolution of those statewide concerns, and is narrowly tailored to avoid unnecessary interference in local government. In so holding, we follow and apply the opinions of the California Supreme Court in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 (*California Fed. Savings*) and *State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547 (*City of Vista*).

The trial court concluded otherwise, and granted a petition for writ of mandamus brought by the City of Huntington Beach (the City), which is a charter city. The court ordered Xavier Becerra, as the California Attorney General, to refrain from enforcing section 7284.6 against the City. Based on our holding that section 7284.6 is constitutional as applied to charter cities, we reverse with directions to deny the writ petition and enter judgment in favor of the Attorney General.

In a companion appeal, *City of Huntington Beach v. Los Alamitos Community United*, G057209, two community organizations and four people challenge the trial court's ruling the CVA is unconstitutional as to charter cities. In that case, we conclude the appellants lack standing to appeal and grant the City's motion to dismiss.

2

## RELEVANT LAW

Resolution of this appeal turns on the relationship and potential conflict among three sources of law:  (1) the CVA, (2) article XI, section 5 of the California Constitution, and (3) the Huntington Beach Charter and municipal code provisions.

## I.

## The CVA

When enacting the CVA, the Legislature found "[i]mmigrants are valuable and essential members of the California community," "[a] relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California," and "[t]his trust is threatened when state and local agencies are entangled with federal immigration enforcement."  (Gov. Code, § 7284.2, subds. (a), (b) & (c).)  As a result, the Legislature found, "immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians."  (*Id.*, subd. (c).)

In addition, the Legislature found that "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments."  (Gov. Code, § 7284.2, subd. (d).)  The Legislature expressed concern that state and local participation in federal immigration enforcement could lead to the unconstitutional detention of California residents who were targeted based on race or ethnicity in violation of the Fourth Amendment to the United States Constitution and the Equal Protection Clause.  (*Id.*, subd. (e).)  The goal of the CVA, the Legislature declared, is "to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments."  (*Id.*, subd. (f).)

3

The CVA carries out its purposes by prohibiting state and local law enforcement from engaging in certain specifically identified acts related to immigration enforcement.  Section 7284.6, the challenged part of the CVA, prohibits state and local law enforcement from:  (1) inquiring into a person's immigration status (*id.*, subd. (a)(1)(A)); (2) detaining a person on the basis of a "hold" request from immigration authorities (*id.*, subd. (a)(1)(B)); (3) providing information regarding a person's release date or responding to requests for notification by providing release dates unless that information is available to the public (*id.*, subd. (a)(1)(C)); (4) providing personal information, such as address and employment status, to immigration authorities, unless that information is available to the public (*id.*, subd. (a)(1)(D)); (5) making or intentionally participating in arrests based on civil immigration warrants (*id.*, subd. (a)(1)(E)); (6) assisting immigration authorities in warrantless searches near the United States border (*id.*, subd. (a)(1)(F)); (7) performing the functions of an immigration agent (*id.*, subd. (a)(1)(G)); (8) placing local law enforcement officers under the supervision of a federal agency for purposes of immigration enforcement (*id.*, subd. (a)(2)); (9) using immigration officers as interpreters for law enforcement matters under the jurisdiction of state or local law enforcement agencies (*id.*, subd. (a)(3)); (10) transferring a person to immigration authorities unless authorized by a judicial warrant or judicial probable cause determination (*id.*, subd. (a)(4)); (11) providing office space exclusively dedicated for immigration agents within a county or city law enforcement facility (*id.*, subd. (a)(5)); and (12) contracting with the federal government for use of California law enforcement facilities to house persons as federal detainees for purposes of civil immigration custody (*id.*, subd. (a)(6)).

The CVA makes clear that California law enforcement agencies are not prohibited from engaging in certain activities with federal authorities.  California law enforcement agencies are not prohibited from investigating, enforcing, detaining upon reasonable suspicion of, or arresting a person for a violation of section 1326(a) of title 8

4

of the United States Code (reentry of removed aliens). (§ 7284.6, subd. (b)(1).) California law enforcement agencies are not prohibited from responding to a request from immigration authorities for information about a specific person's criminal history if otherwise permitted by state law. (*Id.*, subd. (b)(2).) California law enforcement agencies may conduct enforcement or investigative duties associated with a joint law enforcement task force so long as the primary purpose of the task force is not immigration enforcement and the enforcement or investigative duties are primarily related to a violation of law unrelated to immigration enforcement. (*Id*., subd. (b)(3).)

The CVA states that it "does not prohibit or restrict any government entity or official from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of [any] individual, or from requesting from federal immigration authorities immigration status information, lawful or unlawful, of any individual, or maintaining or exchanging that information with any other federal, state, or local government entity, pursuant to [federal immigration laws]." (§ 7284.6, subd. (e).)

The CVA imposes on the California Attorney General the task of preparing and publishing "model policies limiting assistance with immigration enforcement to the fullest extent possible consistent with federal and state law at public schools, public libraries, health facilities operated by the state or a political subdivision of the state, courthouses, Division of Labor Standards Enforcement facilities, the Agricultural Labor Relations Board, the Division of Workers Compensation, and shelters, and ensuring that they remain safe and accessible to all California residents, regardless of immigration status." (Gov. Code, § 7284.8, subd. (a).)

The CVA also imposes restrictions on the Department of Corrections and Rehabilitation (DCR). The DCR must, in advance of an interview between United States Immigration and Customs Enforcement (ICE) and a person in DCR custody, provide that person with a written consent form explaining the purpose of the interview, that the

5

interview is voluntary, and that the person may decline to be interviewed or be interviewed only with an attorney present. (Gov. Code, § 7284.10, subd. (a)(1).) The DCR must, upon receiving an ICE hold, notification, or transfer request, provide a copy of the request to the person who is the subject of the request and inform him or her whether the DCR intends to comply with it. (*Id.*, subd. (a)(2).) The CVA prohibits the DCR from (1) restricting access to "any in-prison educational or rehabilitative programming, or credit-earning opportunity" solely on the basis of citizenship or immigration status and (2) considering citizenship or immigration status in determining a person's custodial classification level. (*Id.*, subd. (b)(1) & (2).)

## II.

## California Constitution, Article XI, Section 5

California law classifies cities as either charter cities, which are organized under a charter (Gov. Code, § 34101), or general law cities, which are organized under the general law of the State of California (*id.*, § 34102). (See *City of Vista, supra*, 54 Cal.4th at p. 552, fn. 1.) The City is a charter city.

Under the home rule doctrine, "[c]harter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to the matters deemed municipal affairs." (*City of Vista, supra*, 54 Cal.4th at p. 555.)

Article XI, section 5 of the California Constitution defines the scope of home rule powers of a charter city. Section 5 does so in two subdivisions. Section 5, subdivision (a) (Section 5(a)) sets out the general rule of municipal self-governance and provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations *in respect to municipal affairs*, subject only to the restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with

6

respect to municipal affairs shall supersede all laws inconsistent therewith." (*Ibid*., italics added; see *Johnson v. Bradley* (1992) 4 Cal.4th 389, 397 (*Johnson*).)

"Whereas subdivision (a) of article XI, section 5 articulates the general principle of self-governance, subdivision (b) sets out a nonexclusive list of four 'core' categories that are, by definition, 'municipal affairs.'" (*Johnson, supra*, 4 Cal.4th at p. 398, fn. omitted.) Article XI, section 5, subdivision (b) of the California Constitution (Section 5(b)) states: "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) *the constitution, regulation, and government of the city police force* (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees." (*Ibid*., italics added.)

## III.

## Huntington Beach Charter and Municipal Code Provisions

Section 103 of the Huntington Beach Charter states: "The City shall have the power to make and enforce all laws and regulations in respect to municipal affairs, subject only to such restrictions and limitations as may be provided in this Charter or in the Constitution of the State of California." Section 2.52.030 of the Huntington Beach Municipal Code states: "It shall be the duty of each and every member of the Police Department to enforce impartially all the laws and statutes of the United States and of the State of California and all of the ordinances of the City, within the limits of this City, and

7

to perform such other and further duties as by statute and ordinance now existing or hereafter enacted, may be imposed upon them in their capacity as peace officers."

Section 2.24.050 of the Huntington Beach Municipal Code states: "The Police Chief shall perform such other acts as the laws of the state and ordinances of the Council may require."

**FACTS AND PROCEDURAL HISTORY**

The City filed a petition for writ of mandamus and a complaint for declaratory relief to "invalidate the unconstitutional mandates of the [CVA] that impermissibly strip the City's constitutionally protected Charter authority with respect to local 'municipal affairs.'" The petition and complaint had three causes of action: (1) writ of mandate, (2) declaratory relief, and (3) injunctive relief. Each cause of action alleged the CVA unconstitutionally violates the City's authority to conduct municipal affairs guaranteed under article XI, section 5 of the California Constitution by mandating how the City operates its police force. As relief, the City prayed for issuance of "[a] Writ of Mandamus that commands and compels [the Attorney General] to comply with [his] respective mandatory and ministerial duties with respect to the City's claims raised in this action, including . . . that [the Attorney General] not enforce the [CVA] against the City and comply with Article XI, § 5 of the California Constitution." The City also prayed for a declaration that the CVA is unconstitutional and preempted by article XI, section 5 of the California Constitution.

In a memorandum of points and authorities in support of the petition for writ of mandamus, the City argued article XI, section 5 of the California Constitution grants charter cities "supreme authority" over municipal affairs, which include operation of the City's police force. The City argued the CVA is "an impermissible, un-Constitutional overreach, is void, and should be invalidated" because it intrudes upon the City's control of its police force. The City submitted a declaration from its Chief of

8

Police, Robert Handy, who voiced a number of criticisms of the CVA. Chief Handy declared the CVA "interferes with effective local law enforcement by limiting the discretion of the City police to work cooperatively with the United States Department of Homeland Security and [ICE]."

The Attorney General filed opposition, which included the legislative history of the CVA, a declaration from Professor Tom K. Wong of the University of California, San Diego, and copies of declarations from four other law enforcement officials that had been filed in a federal court action. Wong concluded: "When undocumented immigrants hear about the [CVA], they have [a] deeper belief that California's laws can protect them, their families, and their communities, and they have more trust that California's laws can protect the confidentiality of witnesses to crimes even if they are undocumented." He also concluded, "When undocumented immigrants hear that some cities in California want to opt out of the [CVA], this has wide-ranging chilling effects as they become significantly less likely to engage with public institutions, including law enforcement."

A hearing was conducted on the City's petition for writ of mandamus and complaint. The City narrowed the scope of relief sought by identifying section 7284.6 as the "operative portion" of the CVA that the City sought to have invalidated.

The trial court granted the City's petition for writ of mandamus and issued an order for the issuance of a peremptory writ of mandate. A peremptory writ of mandate was issued ordering the Attorney General to refrain from enforcing section 7284.6 against the City. In a statement of decision, the court found: (1) the "constitution, regulation and government" of a police force is a "quintessential municipal affair under [Section] 5(a)"; (2) the "constitution, regulation and government" of a police force is "a municipal prerogative" protected by Section 5(b); and (3) "there is no 'statewide concern' justifying the state[']s regulation of a Charter City's police force."

9

The Attorney General timely filed a notice of appeal from the order granting the City's petition for writ of mandamus. An order granting or denying a petition for writ of mandamus is considered a final judgment for purposes of an appeal. (*Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409.)

## DISCUSSION

### I.

### Standard of Review

"[T]he question whether in a particular case the home rule provisions of the California Constitution [article XI, section 5] bar the application of state law to charter cities turns ultimately on the meaning and scope of the state law in question and the relevant state constitutional provisions. Interpreting that law and those provisions presents a legal question, not a factual one. [Citations.] Courts accord great weight to the factual record that the Legislature has compiled [citations], and also to any relevant facts established in trial court proceedings. [Citation.] Factual findings by the Legislature or the trial court, however, are not controlling. [Citation.] The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one." (*City of Vista, supra*, 54 Cal.4th at p. 558.)

### II.

### A Municipal Affair Identified in Section 5(b) Can Be Subject to a General Law of Statewide Concern.

A. *The Four-Part Analytical Framework*

Home rule authority under article XI, section 5 of the California Constitution does not mean charter cities can never be subject to state laws that concern or regulate municipal affairs. "[A] charter city's authority to enact legislation is not unlimited." (*Jauregui v. City of Palmdale* (2014) 226 Cal.App.4th 781, 795 (*Jauregui*).)

10

The Legislature may legislate as to matters of statewide concern and, if the statute is not overbroad, then the conflicting charter city law "ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments." (*California Fed. Savings, supra*, 54 Cal.3d at p. 17.) "[G]eneral law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern." (*People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 600 (*Seal Beach*), quoting *Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 292 (*Professional Fire Fighters*); see *Baggett v. Gates* (1982) 32 Cal.3d 128, 136 (*Baggett*) ["'As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters'"].)

The California Supreme Court has developed a four-part "analytical framework" to determine whether a state law unconstitutionally infringes the home rule authority of charter cities granted by article XI, section 5 of the California Constitution. (*City of Vista, supra,* 54 Cal.4th at p. 556; *California Fed. Savings, supra*, 54 Cal.3d at pp. 16-17.) First, the court determines whether the local law at issue regulates an activity that can be characterized as a municipal affair. (*City of Vista, supra,* at p. 556; *California Fed. Savings, supra*, at p. 16.) Second, the court determines whether there is an actual conflict between state law and the local law. (*City of Vista, supra,* at p. 556; *California Fed. Savings, supra*, at pp. 16-17.) If no conflict exists, the analysis is complete and there is no need to go to the next step. (*California Fed. Savings, supra*, at p. 16.) Third, the court decides whether the state law addresses a matter of "'statewide concern.'" (*City of Vista, supra*, at p. 556; *California Fed. Savings, supra*, at p. 17.) Fourth and finally, the court determines whether the state law is "'reasonably related to . . . resolution'" of the identified statewide concern and is "'narrowly tailored' to avoid unnecessary

11

interference in local governance." (*City of Vista, supra*, at p. 556; *California Fed. Savings, supra*, at p. 17; see *Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 562-563 (*Marquez*); *Jauregui, supra*, 226 Cal.App.4th at pp. 795-796.)

B. *The Language and History of Section 5(a) and Section 5(b)*

The trial court concluded and the City argues the four-part analytical framework of *City of Vista* and *California Fed. Savings* is inapplicable if the local law concerns one of the four municipal affairs identified in Section 5(b). The City argues as to those municipal affairs identified in Section 5(b), which include creation, regulation, and governance of a police force and compensation of city employees, "the four-part test **is *unnecessary*** and the Charter City's authority is limited only by the state and federal constitutions." Thus, according to the City, Section 5(b) grants to charter cities absolute home rule authority over its police department "to the exclusion of any substantive restrictions by the Legislature."

The City's argument is based largely on the language and history of article XI, section 5 of the California Constitution. The language and history of article XI, section 5 lead us to conclude the four-part analytical framework of *City of Vista* and *California Fed. Savings* applies equally to municipal affairs under Section 5(a) and Section 5(b).

The text of a constitutional provision is the starting point of its interpretation and "the best indicator of the intended meaning." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 93.) Section 5(a) states that charter city ordinances "in respect to municipal affairs" are subject only to "restrictions and limitations" provided in the city charter and, with respect to municipal affairs, that the city charter "shall supersede all laws inconsistent therewith." Despite such language, charter city ordinances regulating a municipal affair must give way to inconsistent state laws addressing issues of statewide concern. (E.g., *City of Vista, supra,* 54 Cal.4th at p. 556.)

12

Section 5(a) does not define or provide examples of municipal affairs. Section 5(b) fills the gap left by Section 5(a) by providing a nonexclusive list of four areas defined to be municipal affairs. (See *Johnson, supra*, 4 Cal.4th at p. 398.) Unlike Section 5(a), Section 5(b) does not say that charter city ordinances in those areas are subject only to the restrictions and limitations of the city charter. Nor does Section 5(b) accord any special status to the identified municipal affairs. The most logical interpretation of Section 5(b), particularly when read with Section 5(a), is that it identifies four areas that are at least presumptively deemed to be municipal affairs for purposes of Section 5(a). As relevant here, Section 5(b) deems "the constitution, regulation, and government of the city police force" municipal affairs for purposes of Section 5(a).

The history of article XI, section 5 of the California Constitution supports our interpretation. This history starts with the California Constitution of 1849, under which cities were "but subordinate subdivisions of the State Government," and the Legislature had the power to "enlarge or restrict" city powers. (*Johnson, supra*, 4 Cal.4th at pp. 394-395, quoting *San Francisco v. Canavan* (1872) 42 Cal. 541, 557.) The Legislature often enacted special legislation directly managing the affairs of charter cities. (Peppin, *Municipal Home Rule in California: I* (1941) 30 Cal. L.Rev. 1, 10-12.) The California Constitution of 1879 added article XI, former section 6, which provided: "Cities or towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of this Constitution shall be subject to and controlled by general laws." (Cal. Const., art. XI, former § 6.)

Article XI, former section 6 of the California Constitution, while intended to "emancipate municipal governments from the authority and control formerly exercised over them by the Legislature" (*People v. Hoge* (1880) 55 Cal. 612, 618), was interpreted by the California Supreme Court to make city charters and local laws subordinate to general state law (*Johnson, supra*, 4 Cal.4th at p. 395). In response, article XI, former section 6 was amended in 1896 to read: "Cities and towns heretofore or hereafter

13

organized, and all charters thereof framed or adopted by authority of this constitution, *except in municipal affairs*, shall be subject to and controlled by general laws." (Italics added; see *Johnson, supra*, 4 Cal.4th at p. 395.) The lead opinion by Justice Garoutte in *Fragley v. Phelan* (1899) 126 Cal. 383, 387, concluded the amendment to article XI, former section 6 "was intended to give municipalities the sole right to regulate, control, and govern their internal conduct independent of general laws." Municipal affairs are "the internal regulation and control by municipalities"; that is, "the internal business affairs of the municipality." (*Fragley v. Phelan, supra*, 126 Cal. at p. 387, lead opn. of Garoutte, J.) Justice Harrison also wrote an opinion in which he warned that the amendment to article XI, former section 6 meant charter cities retained control only over municipal affairs identified in the city charter. (*Id.* at pp. 395-396 (conc. opn. of Harrison, J.) "In effect, this meant that city charters were 'not paramount to general state laws, even as to purely municipal affairs, in cases where the charter was silent.'" (*Johnson, supra*, 4 Cal.4th at p. 396.)

The term "municipal affairs" used in article XI, former section 6 was "deceptively simple," and "no universal truth emerged from these words." (Sato, *"Municipal Affairs" in California* (1972) 60 Cal. L.Rev. 1055, 1058.) At the same time that article XI, former section 6 was amended, article XI, former section 8½ was adopted. (See McBain, The Law and the Practice of Municipal Home Rule (1916) p. 370.) Article XI, former section 8½, which was the predecessor of Section 5(b), read, in relevant part: "It shall be competent, in all charters framed under the authority given by section eight of article eleven of this Constitution, to provide, in addition to those provisions allowable by this Constitution and by law of the State, as follows: [¶] . . . [¶] 3. For the manner in which, the times at which, and the terms for which the members of the boards of police commissioners shall be elected or appointed; and for the constitution, regulation, compensation, and government of such boards and of the municipal police force." (Cal. Const., art. XI, former § 8½.)

14

One authority explains the enactment of article XI, former section 8½ was prompted "by cases which had been adjudicated prior to 1896 and by the assumption or fear that the specific powers here conferred would not be regarded by the courts as falling in the general category of municipal affairs." (See McBain, The Law and the Practice of Municipal Home Rule, *supra*, at p. 371.) By enacting article XI, former section 8½, "the people of the State of California sought to confirm to their home rule cities certain specific powers which might otherwise have been excluded by the courts from the category of municipal affairs." (McBain, The Law and the Practice of Municipal Home Rule, *supra*, at p. 372.)

In *Nicholl v. Koster* (1910) 157 Cal. 416, 420-421, the California Supreme Court held a charter city did not have the authority to enact laws relating to municipal affairs identified in article XI, former section § 8½ if the city charter was silent on the subject. (See *Johnson, supra*, 4 Cal.4th at p. 396.) "As a result, municipalities that wished to exercise their constitutionally granted exclusive control over municipal affairs were forced to adopt 'bulky charters' that attempted to enumerate specifically and extensively their municipal powers." (*Ibid.*) An article published in 1913 criticized this result and suggested the California Constitution be amended to imply a grant to all charter cities the powers to legislate all municipal affairs regardless whether a specific function is identified as a municipal affair in a city charter. (*Ibid.*, citing Jones, *"Municipal Affairs" in the California Constitution* (1913) 1 Cal. L.Rev. 132, 145.)

In 1914, article XI was amended by the voters in the manner suggested. Article XI, former section 6 was amended to give charter cities the power "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws." (See *Johnson, supra*, 4 Cal.4th at p. 396.) Article XI, former section 8 was amended by the insertion of a similar provision stating: "It shall be competent in any charter framed under the authority of this

section to provide that the municipality governed thereunder may make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters and in respect to all other matters they shall be subject to general laws." (See *Johnson, supra*, 4 Cal.4th at pp. 396-397.)

Finally, article XI, former section 8½ was amended to grant charter cities "plenary authority . . . subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several . . . municipal officers . . . shall be elected . . . [and] for their compensation." (See *Johnson, supra*, 4 Cal.4th at p. 397.) The provision in article XI, former section 8½ regarding "the constitution, regulation, compensation, and government of . . . the municipal police force" was not changed. (See Voter Information Pamp., Gen. Elec. (Nov. 3, 1914).)

After the 1914 amendments, the municipal affairs provisions of article XI, former sections 6, 8, and 8½ remained unchanged in substance. (See *Johnson, supra*, 4 Cal.4th at pp. 396-397.) "In 1968, as part of the general overhaul of the state Constitution, the California Constitution Revision Commission recommended to the Legislature that the above sections be retained in substance but rewritten and renumbered as new article XI, section 5." (*Id.* at p. 397.) In a 1970 Special Election the voters approved the revised article XI, section 5. (*Ibid.*) The municipal affairs provisions of article XI, former sections 6 and 8 became Section 5(a), while the municipal affairs provisions of Article XI, former section 8½ became Section 5(b). (Historical Notes, 2A West's Ann. Cal. Const. (2013 ed.) foll. art. XI, § 5, p. 245.)

The lesson from this history, as relevant here, is that a charter city may provide in its charter that the city may make and enforce all ordinances and regulations in respect to "municipal affairs" (subject only to restrictions in the city charter) and otherwise is subject to general laws. Because the term "municipal affairs" was subject to judicial interpretation, article XI, former section 8½ (now Section 5(b)) was enacted to

16

ensure that certain identified functions would be municipal affairs and could not by judicial interpretation be deemed otherwise. Thus, Section 5(b) was not intended to and does not create a special class of municipal affairs[1] that are categorically distinct from municipal affairs under Section 5(a). Rather, Section 5(b) merely confirms that certain functions—including the "constitution, regulation, and government of the city police force"—are municipal affairs, just like any other functions deemed municipal affairs under Section 5(a).

C. *California Supreme Court Authority*

The four-part analytical framework of *City of Vista* and *California Fed. Savings* would therefore apply to a state law that is claimed to intrude on a charter city's right under Section 5(b) to create, regulate, and govern a police force, just as it would apply when the municipal affair comes within Section 5(a). Indeed, the California Supreme Court, in assessing the validity of state laws under the home rule doctrine, has never drawn a distinction between municipal affairs under Section 5(a) and Section 5(b).

The California Supreme Court, in *Baggett, supra*, 32 Cal.3d at page 131, indirectly rejected the notion that municipal affairs identified in Section 5(b) can never be subject to state regulation. The issue in *Baggett* was whether the Public Safety Officers' Procedural Bill of Rights (Gov. Code, §§ 3300-3311) (the PSOPBR) applies to charter cities. The defendants argued the PSOPBR could not apply to charter cities because Section 5(b) grants such cities authority over the constitution, regulation, and government of the city police force and plenary authority over the compensation, method of appointment, qualifications, tenure of office, and removal of city employees, including police officers. (*Baggett, supra*, 32 Cal.3d at p. 137.)

---

[1] With perhaps the exception of the election and compensation of municipal officers, for which Section 5(b)(4) grants charter cities "plenary" authority.

17

The Supreme Court first observed that "[s]uperficially" Section 5(b) did "raise some doubts as to whether the [PSOPBR] may be applied to charter cities." (*Baggett, supra*, 32 Cal.3d at p. 137.) Although the PSOPBR "impinge[d] on the city's implied power to determine the manner in which its employees may be removed" (*id*. at p. 138), the PSOPBR addressed a matter of statewide concern—"the maintenance of stable employment relations between police officers and their employers" (*id*. at pp. 139-140). In addition, rights created by the PSOPBR had a "direct, substantial connection" to the Legislature's purpose. (*Id.* at p. 140.) The court held the PSOPBR applied to charter cities notwithstanding their authority granted by Section 5(b) to regulate police departments and "plenary authority" over the removal of employees. (*Baggett, supra*, at pp. 138, 140; see *Morgado v. City and County of San Francisco* (2017) 13 Cal.App.5th 1, 13-15 [administrative appeal provision of the PSOPBR applies to charter cities notwithstanding Section 5(b)]; *Jackson v. City of Los Angeles* (2003) 111 Cal.App.4th 899, 906-907 [statute of limitations of PSOPBR applies to charter cities].)

In *Seal Beach, supra*, 36 Cal.3d at page 600, the California Supreme Court expressly rejected the notion that municipal affairs identified in Section 5(b) can never be subject to state regulation. The issue in *Seal Beach* was whether a charter city must comply with the "'meet-and-confer'" requirement of Government Code section 3505[2] before the city can propose an amendment to its charter concerning the terms and conditions of public employment. (*Seal Beach, supra*, 36 Cal.3d at p. 594.) Plaintiff relators in that case challenged a city charter amendment requiring the immediate firing of any city employee who participated in a strike as being in violation of Government Code section 3505. (*Seal Beach, supra*, at pp. 594-595.) The defendant charter city contended the MMBA violated its absolute right under Section 5(b) to regulate the city

---

[2] Government Code section 3505 was enacted as part of the Meyers-Milias-Brown Act (MMBA), Government Code section 3500 et seq. (*Seal Beach, supra*, 36 Cal.3d at p. 594.)

police force and provide the manner in which city employees may be compensated and removed. (*Seal Beach, supra*, at pp. 599-600.)

The California Supreme Court rejected the defendant charter city's argument and held Government Code section 3505 applied to the defendant charter city. After quoting Section 5(b)(4), the court stated: "What grant of power could sound more absolute? Yet in an unbroken series of public employee cases, starting with *Professional Fire Fighters* . . . and ending for the time being with *Baggett* . . . , it has been held that a 'general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.' [Citation.] Fair labor practices, uniform throughout the state, are a matter 'of the same statewide concern as workmen's compensation, liability of municipalities for tort, perfecting and filing of claims, and the requirement to subscribe to loyalty oaths.' [Citation.] With these precepts in mind, in *Professional Fire Fighters* we resolved a conflict between the statutory right of firemen to organize and the city's 'charter provisions, ordinances and regulations' [citation] in favor of the statute. In *Baggett* . . . , we held it to be of no consequence that the [PSOPBR] conflicted with and impinged on a charter city's power to determine the manner in which its employees could be removed and, generally, impinged 'to a limited extent on the city's general regulatory power over the [police] department.' [Citation.] In the same vein, in *Huntington Beach Police Officers' Assn. v. City of Huntington Beach* (1976) 58 Cal.App.3d 492, a charter city resolution purporting to exclude work hour schedules from the meet-and-confer process was held invalid." (*Seal Beach, supra*, 36 Cal.3d at p. 600.)

In *Jauregui, supra*, 226 Cal.App.4th at page 781, the Court of Appeal followed the reasoning of *Seal Beach* to conclude that provisions of the California Voting Rights Act of 2001 (Elec. Code, §§ 14025-14032) applied to the defendant charter city. The challenged code sections bar a municipality from using at-large elections in a manner

19

that would dilute the votes of members of a protected class. (Elec. Code, §§ 14026, 14028; see *Jauregui, supra*, at p. 793.) The defendant charter city argued it could not be bound by those anti-vote-dilution statutes because Section 5(b) grants charter cities "plenary authority" over elections. (*Jauregui, supra*, at pp. 802-803.) The Court of Appeal rejected that argument. Extensively quoting from *Seal Beach*, the court found the analysis of that opinion "applies with equal force in the municipal election context" and concluded "[t]he plenary authority identified in article XI, section 5, subdivision (b) can be preempted by a statewide law after engaging in the four-step evaluation process specified by our Supreme Court." (*Id.* at p. 803.)

The Court of Appeal in *Marquez, supra*, 32 Cal.App.5th at pages 556 through 557 addressed the issue whether charter cities must comply with state law minimum wage orders. Although Section 5(b) grants charter cities plenary authority over compensation of city employees, the court concluded "the Legislature may constitutionally exercise authority over minimum wages, despite the constitutional reservation of authority in charter cities to legislate as to their municipal affairs." (*Marquez, supra*, at p. 557.) The court summed up the relevant case law as follows: "We take from these cases that article XI, section 5, of the state Constitution limits the Legislature's authority to determine the wages of charter city employees, to cap those wages, and to outsource to a third party the authority to determine employee wages. However, the Legislature may enact laws of broad general application that impact charter city compensation where the state law's infringement on local authority is reasonably related to an important statewide concern." (*Id*. at p. 567.)

These four decisions—*Baggett*, *Seal Beach*, *Juaregui*, and *Marquez*— demonstrate the four-part analytical framework of *City of Vista* and *California Fed. Savings* applies when a state law is challenged as infringing a municipal affair identified in Section 5(b). These decisions confirm what we have gleaned from the language and history of Section 5(a) and Section 5(b); that is, Section 5(b) does not create a special

20

class of municipal affairs but identifies certain activities at least presumptively deemed to be municipal affairs under Section 5(a). A municipal affair identified in Section 5(b) is not immune from any and all state laws; rather, a city ordinance regulating an activity identified in Section 5(b) would by definition and without more be a municipal affair under the first part of the four-part analytical framework of *City of Vista* and *California Fed. Savings*.

In arguing Section 5(b) defines core municipal affairs that are subject only to constitutional and substantive legislative restriction, the City relies on several California Supreme Court cases (listed in the order in which we address them): *Johnson, supra*, 4 Cal.4th 389; *Graham v. Mayor & Board of Trustees* (1907) 151 Cal. 465 (*Graham*); *Ector v. City of Torrance* (1973) 10 Cal.3d 129 (*Ector*); and *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 (*Sonoma County*). None of the cases supports the City's argument.

The City contends *Johnson, supra*, 4 Cal.4th 389 impliedly holds that as to matters identified in Section 5(b), a charter city's authority is limited only by the federal and state constitutions. The issue in *Johnson* was whether a state law banning public financing of election campaigns barred a charter city from enforcing a city charter provision providing for partial public funding of campaigns for city elective offices. (*Johnson, supra*, 4 Cal.4th at p. 392.) The charter city argued that partial public financing of municipal election campaigns constituted a "'manner'" of municipal elections and therefore fell within the city's plenary authority granted by Section 5(b)(4). (*Johnson, supra*, at p. 403.) The California Supreme Court declined to decide whether the city charter provision was by definition a "'core'" municipal affair under Section 5(b)(4) because the court concluded the charter provision was enforceable as a municipal affair under Section 5(a). (*Johnson, supra*, at pp. 403-404.) At footnote 15, the court stated: "Of course, even if a given matter is deemed to be a municipal affair, a charter

21

city's regulation remains subject to the various guarantees and requirements of the state and federal Constitutions." (*Id*. at pp. 403-404, fn. 15.)

It is in footnote 15 that, according to the City, the California Supreme Court "necessarily implied" that a charter city's authority over municipal affairs identified in Section 5(b) is subject only to constitutional limitation. We believe the City is over reading that passage. Because the Supreme Court declined to address whether the city charter provision fell within Section 5(b), the court did not address whether the four-part analytical framework of *City of Vista* and *California Fed. Savings* would apply in that situation or not. And in footnote 14, the court in *Johnson* stated it agreed that "charter cities may not enforce laws that are inconsistent with or impede statewide regulation of the integrity of the political or electoral process" (*Johnson, supra*, 4 Cal.4th at p. 403, fn. 14) even though the conduct of city elections and the manner, method, and times of elections of municipal officers are municipal functions under Section 5(b).

Reading *Johnson* in the manner urged by the City would place that case in conflict with *Seal Beach*. Section 5(b)(4) grants charter cities *plenary* authority "subject only to the restrictions of this article" over the manner in which municipal officers are elected. In *Seal Beach, supra*, 36 Cal.3d 591, the court concluded the plenary authority language in Section 5(b)(4) was not absolute and did not mean local laws regarding removal and compensation of municipal employee were not subject to general laws of statewide concern.

In *Graham, supra*, 151 Cal. 465 at pages 467-468, the court addressed whether a charter city was required to create and pay for a justice court, as required by state law, when the city had created a police court under authority conferred by article XI, former section 8½. The court concluded article XI, former section 8½ did not "interfere with the power of the legislature in the matter of provision for justices of the peace for cities and towns." (*Graham, supra*, at p. 470.) But, the court held, article XI, former section 8½ made the matter of police courts "purely a municipal affair" and requiring a

22

charter city to pay the cost of maintaining the justice court "would be an invasion of the jurisdiction of the municipality, and inconsistent with the charter provision regarding the subject-matter of city police courts." (*Graham, supra*, at pp. 472-473.)

The City cites *Graham* as holding that as to municipal affairs identified in Section 5(b) a city's charter authority is supreme and supersedes all inconsistent laws. (See *Graham, supra*, 151 Cal. at p. 473.) Since *Graham* was decided 112 years ago, California jurisprudence in the area of the home rule doctrine has changed. A city's charter authority under both Section 5(a) and Section 5(b) no longer can be said to be supreme, but is subject to general laws of statewide concern. (E.g. *City of Vista, supra,* 54 Cal.4th at p. 556; *California Fed. Savings, supra*, 54 Cal.3d at pp. 16-17; *Seal Beach, supra*, 36 Cal.3d at p. 600; *Baggett, supra*, 32 Cal.3d at pp. 135, 140; *Professional Fire Fighters, supra*, 60 Cal.2d at pp. 289-295.)

The issue in *Ector, supra*, 10 Cal.3d 129 was whether a city charter requirement that city employees reside within city borders was rendered unenforceable by a state law forbidding such a residence requirement. In a passage relied on by the City, the California Supreme Court stated it was "not without guidance" in resolving whether the residence requirement involved a municipal affair because Section 5(b) is a specific directive that charter cities have plenary authority over the qualifications of their employees. (*Ector, supra*, at p. 132.) The court did not, however, reach the issue whether the state law violated Section 5(b) because, after examining the statutory language and legislative history, the court concluded the state law was limited by its terms to general law cities and did not apply to charter cities. (*Ector, supra*, at pp. 133-134.)

At issue in *Sonoma County, supra*, 23 Cal.3d 296 was a statute, passed in response to Proposition 13, prohibiting the disbursement of state surplus or loan funds to any local public agency granting its employees a cost-of-living pay increase that exceeded the cost-of-living pay increase provided for state employees. In addition, the

23

statute nullified any agreement by a local agency to pay a cost-of-living pay increase that exceeded the cost-of-living pay increase provided for state employees. (*Sonoma County, supra*, at p. 302.) Labor organizations challenged the statute on the ground, among others, it violated Section 5(b)'s grant of plenary authority to charter cities to provide for the compensation of their officers and employees. (*Sonoma County, supra*, at p. 314.) The California Supreme Court, after quoting *Ector* and earlier authority, stated: "It seems clear to us, therefore, that both the language of the Constitution and prior authority support the proposition advanced by [the labor organizations] that the determination of wages paid to employees of charter cities as well as charter counties is a matter of local rather than statewide concern." (*Id.* at p. 317.)

The Supreme Court analyzed the argument made by the respondent counties that the state statute addressed a matter of statewide concern and therefore was binding notwithstanding the plenary authority granted by Section 5(b). (*Sonoma County, supra*, 23 Cal.3d at pp. 318-319.) The court concluded the respondents failed to demonstrate the existence of a statewide emergency and for that reason rejected their argument that the state statute prevailed over the salary ordinances and resolutions enacted by charter cities and counties. (*Id.* at p. 318.)

The City argues the four-part analytical framework of *City of Vista* and *California Fed. Savings* would be "ridiculously redundant" if made applicable to the municipal affairs identified in Section 5(b) because the first part of that framework is to determine whether the activity in issue is a municipal affair. This argument is without merit. A charter city measure addressing an activity identified in Section 5(b) would automatically satisfy the first part of the analytical framework and thus move the inquiry along to the second part without further ado.

A more fundamental problem, the City argues, is if a state law prevails over a city charter measure addressing activity deemed a municipal affair identified in Section 5(b), then by definition that activity ceases to be a municipal affair. Because Section 5(b)

24

identifies activities that are by definition municipal affairs, the City argues the application of the four-part analytical framework of *City of Vista* and *California Fed. Savings* to state law addressing such activity would effect a de facto repeal of Section 5(b). This argument is mistaken because a subject of regulation can be both a municipal affair and a matter of statewide concern, depending on the "historical" and "factual" context. (*City of Vista, supra*, 54 Cal.4th at p. 557.) As stated in *California Fed. Savings*, "[i]n performing that constitutional task, courts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern." (*California Fed. Savings, supra*, 54 Cal.3d at p. 17.) If a state statute addresses an issue of statewide concern and is reasonably related to resolving that concern, "then the conflicting charter city measure ceases to be a 'municipal affair' *pro tanto*." (*Ibid.*, italics added.) The term "pro tanto" means "[t]o that extent; for so much; as far as it goes." (Black's Law Dict. (11th ed. 2019) p. 1478.) In other words, the city charter measure ceases to be a municipal affair only to the extent or so far as it is in conflict with a statute addressing a matter of statewide concern; the measure does not cease to be a municipal affair altogether.

D. *Substantive/Procedural Distinction*

The City acknowledges that in *Baggett* and *Seal Beach* the California Supreme Court upheld state laws infringing the conduct of municipal affairs identified in Section 5(b). The City maintains, however, the state laws in those cases "impose[d] mere procedural regulations, rather than substantive limitations, on a Charter City's authority over its municipal affairs." The City thus asserts "the Supreme Court has repeatedly stressed that this exception to the home rule supremacy over enumerated Core Municipal Affairs is limited to setting forth ***procedural*** standards rather than ***substantive*** obligations or prohibitions."

In regards to issues of the compensation, qualification, and removal of charter city employees, which come within Section 5(b)(4), the California Supreme Court has emphasized "there is a clear distinction between the *substance* of a public employee issue and the *procedure* by which it is resolved." (*Seal Beach, supra*, 36 Cal.3d at p. 600, fn. 11.) Thus, "the process by which salaries are fixed" is an issue of statewide concern, while the salaries themselves of charter city employees are not subject to general laws. (*Id.* at pp. 600-601, fn. 11.)

In *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 282 (*County of Riverside*), the California Supreme Court struck down, as violating county home rule constitutional provisions, a state law requiring counties and other agencies to submit to binding arbitration economic issues arising during negotiations with unions representing firefighters or law enforcement officers. A proponent of the state law argued it was valid because it involved a matter of statewide concern. (*Id.* at p. 286.) The court reviewed cases addressing state laws regulating relations between local governments and their employees, including *Baggett*, *Seal Beach*, and *Sonoma County*, and concluded they permitted the imposition of procedural requirements governing employee relations. (*Id*. at pp. 287-289.) The state law in issue was invalid, the court reasoned, because it "is not merely procedural" but "is substantive," and "permits a body other than the county's governing body to establish local salaries." (*Id.* at p. 289.)

In *City of Vista, supra*, 54 Cal.4th at page 564, the court struck down the state law regulating the wages of local government contract workers in part because "it imposes substantive obligations on charter cities, not merely generally applicable procedural standards." The substantive nature of the state law "undermined" its proponent's assertion that it addressed a statewide concern. (*Id.* at p. 565.)

The Court of Appeal, in *Dimon v. County of Los Angeles* (2008) 166 Cal.App.4th 1276, 1279, 1289-1290, used this procedural/substantive dichotomy to conclude state laws regulating compensation for meal periods did not apply to county

26

probation officers. The court stated: "Another factor to be considered in determining if a state law reflects a matter of statewide concern so that it applies to a charter county is whether the law is procedural or substantive. A procedural (state) law leaves the ultimate decision making authority about employee compensation, job qualifications, or reasons to terminate in the hands of the charter county and thus can be applied to it. ([*Baggett*].) On that basis, our Supreme Court has upheld the application of the [PSOPBR] [citation] to a charter city ([*Baggett*]) and has found that a charter city is required to comply with the meet-and-confer requirements found in Government Code section 3500 et seq. before proposing amendments to the city charter concerning the terms and conditions of public employment ([*Seal Beach*].) A substantive law, on the other hand, takes away a charter county's ability to establish local salaries and control working conditions." (*Id.* at pp. 1289-1290.) The Court of Appeal held the state law regulating compensation for meal periods was substantive because "it would divest the County of its ability to provide for and regulate meal periods and to prescribe the remedy (if any) for violation of its regulation(s)." (*Id.* at p. 1290.)

Yet in *Marquez, supra*, 32 Cal.App.5th 552, the Court of Appeal held the statewide minimum wage law, no doubt very substantive, applied to charter cities notwithstanding Section 5(b)(4). The *Marquez* court addressed *Baggett*, *Seal Beach*, *Sonoma County, County of Riverside,* and *City of Vista* but drew no substantive/procedural distinction from them. Instead, the *Marquez* court concluded from those cases that "the Legislature may enact laws of broad general application that impact charter city compensation where the state law's infringement on local authority is reasonably related to an important statewide concern." (*Marquez, supra*, 32 Cal.App.4th at p. 567.) The *Marquez* court responded to an argument that the challenged law was substantive by concluding, "the distinction between substantive and procedural measures is not determinative, and substantive laws displacing local authority over municipal affairs have been upheld by the courts." (*Id.* at p. 573.) The *Marquez* court cited

27

*Jauregui*, in which the Court of Appeal made no substantive/procedural distinction in concluding the California Voting Rights Act of 2001 applied to charter cities. (*Jauregui, supra*, 226 Cal.App.4th at pp. 788, 802-804.)

Recently, in *Anderson v. City of San Jose* (2019) 42 Cal.App.5th 685, 715 (*Anderson*), the Court of Appeal, faced with a contention that a state law was substantive, stated *Marquez* "aptly summarized the balance of considerations when the law in question substantively regulates a municipal affair." In *Anderson*, the Court of Appeal concluded the state's Surplus Land Act (Gov. Code, §§ 54220-54233) preempted a conflicting city policy regarding the sale of surplus municipal property. (*Anderson, supra*, at p. 693.) The Surplus Land Act, the court found, was "neither entirely procedural nor substantive in effect" and had specific substantive requirements. (*Id.* at p. 713.) The substantive requirements did not render the Surplus Land Act inapplicable to charter cities, and "courts have upheld state regulation of municipal affairs on numerous occasions after identifying a countervailing statewide concern." (*Id.* at p. 714.)

In summary, the substantive/procedural distinction has been made, or rejected in the case of *Marquez*, in situations in which charter city or charter county authority is asserted in the areas of the manner of electing city officials and the qualification, compensation, tenure, and removal of local government employees.[3] Whether the same distinction should, must, or could be made in cases arising under Section 5(b)(1)—the constitution, regulation, and government of a charter city police force—is a different matter. It has been said that a procedural law defines or creates the mode of procedure by which a legal right is enforced, while substantive law gives and declares that right. (*Shisler v. Sanfer Sports Cars, Inc.* (2008) 167 Cal.App.4th 1, 10.) Does the CVA create or declare rights, or does it define the mode of procedure to enforce rights? It appears section 7284.6 does not create or declare substantive rights but

---

[3] The City contends the CVA unconstitutionally infringes its right to compensate employees, a municipal affair under Section 5(b)(4).

regulates police *procedures* with the stated goals of ensuring effective policing, enhancing public safety, and protecting already established constitutional rights. But "substance and procedure are not always dichotomous" (*Anderson, supra*, 42 Cal.App.5th at p. 714), and the CVA might have both procedural and substantive provisions.

We do not enter the legal thicket of determining whether section 7284.6 is procedural or substantive. We agree with *Marquez* that the distinction between substantive and procedural laws is not determinative of whether a state law may infringe a charter city's home rule authority under Section 5(b). Whether the CVA is substantive or procedural might have some bearing on whether it addresses a statewide concern and is narrowly tailored to resolve that concern, but simply labelling it as one or the other should not be the decisive factor in its application to charter cities. The better course of action is to apply the four-part analytical framework of *City of Vista* and *California Fed. Savings* to section 7284.6 as it is, without characterizing it as substantive or procedural.

## III.

### Under the Four-Part Analytical Framework, the CVA Applies to Charter Cities Without Violating the California Constitution.

A. *Part One: The Huntington Beach Charter and Municipal Code Provisions Regulate Municipal Affairs.*

The first part of the four-part analytical framework is to determine whether the city ordinance at issue regulates an activity that can be characterized as a municipal affair. (*City of Vista, supra,* 54 Cal.4th at p. 556.) The City identifies two charter provisions and one municipal code section as unconstitutionally infringed by section 7284.6. The first is section 103 of the Huntington Beach Charter, set out above, which gives the City the power to make and enforce all laws and regulations in respect to municipal affairs. The second is section 105 of the Huntington Beach Charter, which provides the "City may exercise any of its powers or perform any of its functions . . . with

29

. . . the United States or any agency thereof." The ordinance identified is Huntington Beach Municipal Code section 2.52.030, also quoted above, which makes it "the duty of each and every member of the Police Department to enforce impartially all the laws and statutes of the United States and of the State of California and all of the ordinances of the City."

The discussion in the preceding section leaves no doubt Huntington Beach Charter section 103 and Huntington Beach Municipal Code section 2.52.030 regulate activity that can be characterized as a municipal affair—the constitution, regulation, and government of the City police force. (See § 5(b)(1).) Huntington Beach Charter section 103 is broadly drafted to include all city functions, including operation of the police force.

The City also asserts the CVA unconstitutionally infringes its right to compensate employees. While compensation of employees is a municipal affair under Section 5(b)(4), the City never explains how the CVA affects employee compensation and never identifies a charter provision or municipal code section at odds with the CVA on that subject.

B. *Part Two: There Is an Actual Conflict Between Section 7284.6 and Huntington Beach Charter Section 103.*

In part two of the analytical framework, we determine whether there is an actual conflict between section 7284.6 and the invoked charter and municipal code provisions. (*City of Vista, supra,* 54 Cal.4th at p. 556.) "[A] court asked to resolve a putative conflict between a state statute and a charter city measure initially must satisfy itself that the case presents an actual conflict between the two." (*California Fed. Savings, supra*, 54 Cal.3d at p. 16.) "The question whether an actual conflict exists between state law and charter city law presents a matter of statutory construction. [Citation.] Charter city law is contradictory to state law when it is inimical thereto. [Citation.] '[N]o inimical conflict will be found where it is reasonably possible to

30

comply with both the state and local laws.'" (*City of El Centro v. Lanier* (206) 245 Cal.App.4th 1494, 1505.)

We agree with the Attorney General there is no actual conflict between section 7284.6 and Huntington Beach Municipal Code section 2.52.030. The City argues that municipal code section imposes a requirement on every member of the City police department to enforce all the laws, both federal and state, and to do so impartially. The Attorney General argues the municipal code section only imposes a requirement of impartial enforcement, and does not mean the members of the police department must enforce every single state and federal law, an impossibility by some measure. We conclude the Attorney General's interpretation is more plausible. Which laws to enforce at any given time is a matter of police regulation and command decisions based on resources, demands, and priorities. Further, the obligation to enforce all laws would include the obligation to enforce the CVA. Under section 2.24.050 of the Huntington Beach Municipal Code, the police chief must "perform such other acts" as state law requires, and such acts would include the requirements imposed by the CVA.

Nor do we find a conflict between section 7284.6 and Huntington Beach Charter section 105. Section 105 says only the City "*may* exercise" its powers or perform its functions with the United States or one of its agencies. (Italics added.) Section 105 does not say the City must do so and is not limited to immigration enforcement. Section 105 thus imposes no obligations on the City to participate with federal agencies in enforcing immigration law. Likewise, "Federal law provides states and localities the *option,* not the *requirement*, of assisting federal immigration authorities. [The CVA]

31

simply makes that choice for California law enforcement agencies." (*United States v. California* (9th Cir. 2019) 921 F.3d 865, 889.)[4]

The City has never identified a relevant charter or municipal code provision regarding employee compensation. We therefore cannot tell whether there is any actual conflict between such a charter or municipal code provision and the CVA.

We do find a conflict, however, between section 7284.6 and Huntington Beach Charter section 103, which grants the City its full constitutional power to make and enforce laws regarding municipal affairs. "A city need only provide in its charter that it may 'make and enforce all laws and regulations in respect to municipal affairs' to transform a charter from an instrument conferring specific powers to one granting broad, residual powers except as expressly limited by the charter." (Sato, *supra,* 60 Cal. L.Rev. at pp. 1056-1057, fn. omitted; see *West Coast Adver. Co. v. San Francisco* (1939) 14 Cal.2d 516, 521.) Huntington Beach Charter section 103 thus confers on the City a broad grant of authority over any and all legally cognizable municipal affairs, including authority over "the constitution, regulation, and government of the police force." (§ 5(b)(1).)

"[A] 'conflict' may exist between state and local authority even though the city has not specifically legislated on that point through its charter, or by other 'enactment.'" (*Johnson, supra*, 4 Cal.4th at p. 399, fn. 9.) By prohibiting state and local law enforcement from engaging in certain activities related to immigration enforcement, section 7284.6 directly restricts the regulation of the City police force. Huntington Beach

---

[4] In *United States v. California*, the Ninth Circuit Court of Appeals upheld the CVA against a challenge by the United States that it is preempted by and violates federal law. (*United States v. California, supra*, 921 F.3d at pp. 873, 886-895.) The Ninth Circuit concluded the CVA "is consistent with California's prerogative under the Tenth Amendment and the anti-commandeering rule." (*Id.* at p. 873.) The only issue we address, however, is whether section 7284.6 violates the California Constitution if applied to charter cities.

Charter section 103 would grant the City authority, for example, to regulate its police force by having its officers inquire into an arrestee's immigration status or participate in arrests based on civil immigration warrants. Subdivisions (a)(1)(A) and (a)(1)(E) of section 7284.6 prohibit such activity.

Because there is an actual conflict between section 7284.6 and Huntington Beach Charter section 103, we move to the issue whether the CVA, and section 7284.6 in particular, addresses a matter of statewide concern.

C. *Part Three: The CVA Addresses a Matter of Statewide Concern.*

In the third part of the analytical framework, we decide whether the state law addresses a matter of statewide concern. (*City of Vista, supra*, 54 Cal.4th at p. 556.) "When, as here, state law and the ordinances of a charter city actually conflict and we must decide which controls, 'the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations.' [Citation.] In other words, for state law to control there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters." (*Id.* at p. 560, quoting *California Fed. Savings, supra*, 54 Cal.3d at p. 18.) "The issue is whether [the concern] is of sufficient extramural dimension to support legislative measures reasonably related to its resolution." (*California Fed. Savings, supra*, 54 Cal.3d at pp. 23-24.)

We accord "great weight" to the factual record compiled by the Legislature and to any relevant facts established in trial court proceedings. (*City of Vista, supra*, 54 Cal.4th at p. 558.) "The basis for deferring to the legislative evaluation of a problem is that '"the factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern."'" (*Anderson, supra*, 42 Cal.App.5th at p. 707, quoting *County of Riverside,*

33

*supra*, 30 Cal.4th at pp. 286-287.) Nonetheless, factual findings made by the Legislature and the trial court are not controlling, and the decision whether a state law addresses a statewide concern is a legal issue to be decided by the court. (*Anderson, supra*, at p. 707; see *County of Riverside, supra*, 30 Cal.4th at p. 286 ["The judicial branch, not the legislative, is the final arbiter of this question"].) Any doubt as to whether a matter is of statewide or strictly local concern must be resolved in favor of "'the legislative authority of the state.'" (*California Fed. Savings, supra,* 54 Cal.3d at p. 24.)

The Legislature made substantial and detailed findings to support its enactment of the CVA. We quote them in full:

"(a) Immigrants are valuable and essential members of the California community. Almost one in three Californians is foreign born and one in two children in California has at least one immigrant parent.

"(b) A relationship of trust between California's immigrant community and state and local agencies is central to the public safety of the people of California.

"(c) This trust is threatened when state and local agencies are entangled with federal immigration enforcement, with the result that immigrant community members fear approaching police when they are victims of, and witnesses to, crimes, seeking basic health services, or attending school, to the detriment of public safety and the well-being of all Californians.

"(d) Entangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments.

"(e) State and local participation in federal immigration enforcement programs also raises constitutional concerns, including the prospect that California residents could be detained in violation of the Fourth Amendment to the United States Constitution, targeted on the basis of race or ethnicity in violation of the Equal Protection Clause, or denied access to education based on immigration status. See *Sanchez Ochoa*

34

*v. Campbell, et al.* (E.D. Wash. 2017) 2017 WL 3476777; *Trujillo Santoya v. United States, et al.* (W.D. Tex. 2017) 2017 WL 2896021; *Moreno v. Napolitano* (N.D. Ill. 2016) 213 F.Supp.3d 999; *Morales v. Chadbourne* (1st Cir. 2015) 793 F.3d 208; *Miranda-Olivares v. Clackamas County* (D. Or. 2014) 2014 WL 1414305; *Galarza v. Szalczyk* (3d Cir. 2014) 745 F.3d 634.

"(f)  This chapter seeks to ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California, and to direct the state's limited resources to matters of greatest concern to state and local governments.

"(g)  It is the intent of the Legislature that this chapter shall not be construed as providing, expanding, or ratifying any legal authority for any state or local law enforcement agency to participate in immigration enforcement."  (Gov. Code, § 7284.2.)

We accord those legislative findings great weight and, though not controlling, we conclude as a matter of law they sufficiently identify statewide concerns that justify binding charter cities to the dictates of section 7284.6.  It is virtually self-evident that public safety is a matter of statewide concern (cf. *O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1076 [prostitution and trafficking of controlled substances are matters of statewide concern]); that is why California has a lengthy Penal Code and a vast state prison system.  "The historic police powers of the State include the suppression of violent crime and the preservation of community safety.  In this power inheres the authority to structure and influence the relationship between state law enforcement and the community it serves."  (*United States v. California* (E.D. Cal. 2018) 314 F.Supp.3d 1077, 1108, affd. in part & revd. in part *United States v. California, supra*, 921 F.3d 865.)

The California Assembly Committee on Public Safety understood the statewide public safety concerns justifying the CVA.  That committee, in a hearing held on June 13, 2017, summarized a study by the University of Illinois at Chicago, which

35

found: (1) 44 percent of surveyed Latinos were less likely to contact police officers if they had been victims of a crime for fear of police inquiring into their immigration status; (2) 45 percent were less likely to volunteer information about a crime and were less likely to report a crime for fear of police inquiring into their immigration status; (3) 70 percent of undocumented immigrants reported they were less likely to contact law enforcement if they were victims of a crime; (4) 28 percent of U.S.-born Latinos were less likely to contact police if they were victims of a crime for fear of police inquiring into their immigration status; and (5) 38 percent of Latinos feel like they are under more suspicion now that local law enforcement have become involved in immigration enforcement, with the figure rising to 58 percent among undocumented immigrant respondents. (See *City and County of San Francisco v. Sessions* (N.D. Cal. 2018) 349 F.Supp.3d 924, 938-939.)

The University of Illinois at Chicago study found, "[c]oncerns have been raised that the increasing involvement of state and local police in immigration enforcement will increase the mistrust immigrant communities have towards the police, thereby reducing public safety." Giving priority to immigration enforcement means that "law enforcement resources will be directed away from important public safety objectives." The study supports the Legislature's finding that the CVA was necessary to promote public safety and law enforcement.

In opposition to the City's Petition for writ of mandamus, the Attorney General submitted copies of declarations from four law enforcement officials: (1) Arif Alikhan, the Los Angeles Police Department Director of Office of Constitutional Policing and Policy; (2) Bruce Goldstein, Sonoma County Counsel; (3) Jim Hart, Santa Cruz County Sheriff; and (4) Jeffrey F. Rosen, Santa Clara County District Attorney. These declarations had been filed in federal court litigation over the CVA. Alikhan declared: "The cooperation of immigrant communities to report crimes and assist in the investigation and prosecution of criminals is critical to the fair and effective enforcement of the law and the safety of all members of the community." Hart declared: "We firmly

36

believe that cooperation with ICE harms our relationship with our immigrant community and results in a less safe community because immigrants fail to disclose crimes that they witness and/or are victims to out of fear of deportation" and "based on my experience, I have found that community members are less forthcoming in assisting the Santa Cruz Sheriff's Office if it were viewed as an extension of [ICE]." Rosen declared: "Fear of deportation by victims, witnesses, and families and friends of undocumented victims and witnesses has a toxic effect on our ability to detect and prosecute crime, thereby making the entire community less safe." These declarations support the Legislature's finding that lack of trust between immigrants and law enforcement is detrimental to public safety.

Immigrants live throughout the State of California and, as the Legislature found, are a large portion of its population. Law enforcement agencies throughout the state interact with immigrants. The need for immigrants to report crimes, work with law enforcement, and serve as witnesses, is therefore a statewide, and not purely local, concern.

Public health is a matter of statewide concern (*City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 886), as is education (*Butterworth v. Boyd* (1938) 12 Cal.2d 140, 152; *Madsen v. Oakland Unified Sch. Dist.* (1975) 45 Cal.App.3d 574, 578). The Legislature's finding that immigrant community members might be deterred from seeking health care or attending school if local law enforcement were "entangled with federal immigration enforcement" raises an issue of statewide concern. Goldstein, the Sonoma County Counsel, declared that after the devastating wildfires in Sonoma County in October 2017, immigrant families avoided interacting with local, state, and federal government agencies for fear of federal immigration raids.

The treatment and welfare of immigrants, whatever their status, is a matter of statewide concern. (See e.g., Gov. Code, § 7285, subd. (a) ["All protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have

37

applied for employment, or who are or who have been employed, in this state"].) As the Legislature found, "[a]lmost one in three Californians is foreign born and one in two children in California has at least one immigrant parent." (*Id.*, § 7284.2, subd. (a).) The health, education, and legal treatment of a group of people of this size and residing throughout the state is, virtually by description, a matter of statewide concern.

Finally, we conclude the protection of the constitutional rights of California residents is a matter of paramount statewide concern. The State of California has a constitution which guarantees and protects certain rights to all people. (Cal. Const., art. I, § 1 ["All people are by nature free and independent and have inalienable rights"].) The Legislature found that state and local participation in federal immigration enforcement programs would create the risk that California residents would suffer violations of their constitutional rights. Guaranteeing rights and protections afforded by the state constitution is a matter of statewide concern.

Uniform application of the CVA throughout the state is necessary to ensure it adequately addresses these statewide concerns. "If every city and county were able to opt out of the statutory regime simply by passing a local ordinance, the statewide goal[s] of [public safety, better law enforcement, and protection of constitutional rights] would surely be frustrated." (*Fiscal v. City and County of San Francisco* (2008) 158 Cal.App.4th 895, 919.)

Evidence was presented to the trial court to support the need for uniform application of the CVA. In opposition to the City's Petition for writ of mandamus, Professor Wong, an expert on immigration policy, prepared and submitted a declaration describing the results of his recent academic survey of 158 undocumented Mexican nationals in Southern California. On the matter of opting out of the CVA, Wong presented two conclusions. First, he concluded: "When undocumented immigrants hear about the [CVA], they have [a] deeper belief that California's laws can protect them, their families, and their communities, and they have more trust that California's laws can

38

protect the confidentiality of witnesses to crimes even if they are undocumented. These beliefs are severely eroded when undocumented immigrants hear that some cities in California want to opt out of the [CVA]." Second, he concluded: "When undocumented immigrants hear about the [CVA], they are more likely to engage with a broad range of public institutions, including being more likely to report crimes that they witness to the police, being more likely to report crimes that they are victims of to the police, use public services (e.g., go to City Hall) that requires them to give their personal contact information, do business (e.g., open a bank account, get a loan) that requires them to give their personal contact information, participate in public events where police may be present, and report wage theft by their employer. When undocumented immigrants hear that some cities in California want to opt out of the [CVA], this has wide-ranging chilling effects as they become significantly less likely to engage with public institutions, including law enforcement."

The fact that California is highly urbanized and integrated makes uniform statewide application of the CVA all the more critical. Over 37 years ago, the California Supreme Court recognized "[o]ur society is no longer a collection of insular communities" and "[c]ommunities today are highly interdependent." (*Baggett, supra*, 32 Cal.3d at p. 140.) Cities in large and even medium-sized metropolitan areas flow seamlessly into one another and millions of people pass through them daily along freeways and intercity thoroughfares. As the Attorney General points out, the City police department not only protects the City's nearly 200,000 residents, but "millions of visitors each year." Police officers, including those employed by the City, have authority "any place in the state." (Pen. Code, § 830.1, subd. (a).) If a charter city were allowed to opt out of the CVA, the effect would not be limited to the city's residents but would extend beyond the city's boundaries.

In support of the petition for writ of mandamus, the City submitted a declaration from its police chief, Handy, who severely criticized the CVA. He declared:

39

(1) the CVA limited and interfered with the City's ability to operate its jail; (2) tactical use of immigration in policing is an important law enforcement tool; (3) the CVA placed restrictions on law enforcement that allow criminals to be released into communities; (4) the CVA interfered with a contract the City police department had with ICE to participate in joint operations, and (5) the CVA interfered with effective law enforcement and limited the discretion of the City's police officers to work cooperatively with the Department of Homeland Security, including ICE. Chief Handy also declared that before passage of the CVA, "[t]here was not a sense in the immigrant community that the trust of Huntington Beach Police Department was eroded because the Police Department utilized the services of Federal Immigration Authorities."

Handy's credentials and experience are impressive, and his service is to be commended. His declaration does not, however, alter our conclusion the CVA addresses a matter of statewide concern. Handy's statement about the degree of trust the immigrant community has in the City's police force is made without any facts or studies in support. Most importantly, Handy's declaration must be considered against the Legislature's thorough and detailed findings (to which we accord great weight), the evidence cited in the legislative history of the CVA (such as the research report from the University of Illinois at Chicago), Wong's declaration, and the declarations of the four law enforcement officials that had been prepared for the federal court action. Weighed against that record, Handy's declaration does not convince us the CVA addresses strictly local concerns.

D. *Part Four: The CVA Is Reasonably Related to the Statewide Concerns.*

The fourth part of the analytical framework directs us to determine "whether the law is 'reasonably related to . . . resolution' of [the statewide] concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance." (*City of Vista, supra*, 54 Cal.4th at p. 556.) "[T]he state law must be reasonably related to the issue at hand and limit the incursion into a city's municipal interest." (*Lippman v.*

40

*City of Oakland* (2017) 19 Cal.App.5th 750, 765.) All that is required is a "direct, substantial connection between the rights provided by the [CVA] and the Legislature's asserted purpose." (*Baggett, supra*, 32 Cal.3d at p. 140.)

The CVA, in particular section 7284.6, is reasonably related to the statewide concerns of effective policing, public health and safety, prudent use of public resources, and protection of constitutional rights. Section 7284.6 limits or prohibits certain law enforcement activities, such as inquiring into immigration status and placing a person on an immigration hold, that erode trust between immigrants and the police. Section 7284.6 thereby encourages both immigrants and nonimmigrants to report crimes, work with law enforcement, and serve as witnesses. These restrictions are not only related to public safety, but make it more likely that immigrants and others will seek education and medical care. By prohibiting local law enforcement agencies from participating in arrests based on civil immigration warrants, assisting immigration authorities in warrantless searches near the United States border, performing the functions of an immigration agent, and providing office space to immigration agents, section 7284.6 works to ensure that public law enforcement resources are dedicated to fighting state-law crimes, which pose a greater threat to the safety of California communities.

What the CVA does not do demonstrates it is narrowly tailored and does not intrude unnecessarily into municipal interests. In particular, section 7284.6, subdivision (b) lists those activities the CVA does not prevent local law enforcement from undertaking. Those activities are engaging in activity related to enforcement of title 8 of the United States Code section 1326(a) (reentry of removed aliens), responding to a request from immigration authorities for information about a specific person's criminal history if otherwise permitted by state law, and participating in a joint law enforcement task force so long as the primary purpose of the task force is not immigration enforcement. (§ 7284.6, subd. (b)(1), (2) & (3).) Section 7284.6, subdivision (e)

41

expressly states the CVA does not prohibit or restrict a government entity or official from sending to or receiving from federal immigration authorities information regarding a person's citizenship and immigration status.

The restrictions placed on local law enforcement agencies by section 7284.6 must be read in conjunction with Government Code section 7282.5. Section 7284.6, subdivision (a)(1)(C) prohibits a local law enforcement agency from providing information about a person's release date from incarceration unless that information is public or provided in response to a notification request from immigration authorities in accordance with Government Code section 7282.5. Section 7284.6, subdivision (a)(4) prohibits a local law enforcement agency from transferring a person to immigration authorities unless authorized by judicial warrant or a probable cause determination, or in accordance with section 7282.5. It is significant that section 7282.5, subdivision (a) provides that a law enforcement official (defined to include an official charged with operating jails) may engage in the activities described in section 7284.6, subdivisions (a)(1)(C) and (a)(4) when the person being held has been convicted of any one of dozens of specified state-law crimes,[5] is registered on the California Sex and Arson Registry, or has been convicted of a federal crime that meets the definition of an aggravated felony.

Reading section 7284.6, subdivisions (a)(1)(C) and (a)(4) with Government Code section 7282.5 shows the Legislature narrowly tailored the CVA to address legitimate public safety and other statewide concerns and not to thwart the ability of state and local law enforcement to transfer dangerous felons to federal immigration officials. The CVA does not prohibit all local law enforcement activity related to immigration or a

---

[5] These crimes include all of those identified in Penal Code sections 1192.7, subdivision (c) and 667.5, subdivision (c); "a felony punishable by imprisonment in the state prison"; and a host of other felonies and misdemeanors punishable as either a misdemeanor or a felony. (Gov. Code, § 7282.5, subd. (a)(1), (2) & (3).)

42

person's immigration status, but only prohibits such activity to the extent necessary to resolve the statewide concerns identified by the Legislature.

The City's only argument regarding the fourth step of the analytical framework is the CVA exempts the California Department of Corrections and Rehabilitation (CDCR) from its mandates. The City argues the CVA leaves intact Penal Code section 5026, which requires the CDCR to provide federal immigration authorities the "use of prison facilities, transportation, and general support, as needed, for the purposes of conducting and expediting deportation hearings and subsequent placement of deportation holds on undocumented aliens who are incarcerated in state prison." (*Ibid.*) "In other words," the City argues, "the CDCR is required under state law to do what [the CVA] otherwise purports to prohibit all Charter Cities' police departments from doing."

Section 7284.6 applies to all "California law enforcement agencies," which is defined to include "a state or local law enforcement agency" but to exclude the CDCR. (Gov. Code, § 7284.4, subd. (a).)[6] The exclusion of the CDCR from section 7284.6 is rationally related to the CVA's purpose of encouraging immigrants to report crimes, cooperate with the police, and serve as witnesses. The CDCR operates California's state prison system (Gov. Code, § 12838 et seq.) and is not involved in workaday law enforcement activities. Persons subject to CDCR authority already are convicted felons. In addition, if the CDCR were subject to section 7284.6, it nonetheless would be able pursuant to Government Code section 7282.5 to provide information regarding release dates and transfer people to immigration authorities.

Further, the CDCR is bound by the CVA provisions set out in Government Code section 7284.10. The CDCR must obtain written consent from an inmate before allowing ICE to interview him or her and notify any inmate in custody that ICE has issued a hold, transfer, or notification request for that person. (*Id.*, § 7284.10, subd.

---

[6] Section 7284.6, subdivision (f) preserves a California law enforcement agency's right to assert its own jurisdiction over criminal law enforcement matters."

43

(a)(1) & (2).) The CDCR must not restrict, solely on the basis of immigration status, an inmate's access to education or rehabilitation programs or opportunities to earn credits, and must not consider citizenship or immigration status in determining an inmate's custodial classification level. (*Id.*, subd. (b)(1) & (2).)

E. *Conclusion*

We conclude, based on our application of the four-part analytical framework set forth in *City of Vista* and *California Fed. Savings*, section 7284.6 does not unconstitutionally infringe a charter city's rights under Section 5(b) to constitute, regulate, and govern a city police force or to compensate city employees. This conclusion means we need not address the Attorney General's argument based on the doctrine of state preemption of local regulation.

## DISPOSITION

The judgment is reversed and the matter is remanded with directions to deny the petition for writ of mandamus and enter judgment in favor of Appellant. Appellant to recover costs on appeal.

FYBEL, ACTING P. J.

WE CONCUR:

IKOLA, J.

GOETHALS, J.

44